FREEMAN UNITED COAL MINING COMPANY, Petitioner, v. THE HU-
MAN RIGHTS COMMISSION *et al.*, Respondents.

Fifth District   No. 5—87—0290

Opinion filed August 9, 1988.

Richard R. Elledge and Kathryn S. Mueller, both of Gould & Ratner, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Respicio F. Vazquez, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

John W. Huffman and Don E. Prosser, both of Gilbert, Kimmel, Huffman & Prosser, Ltd., of Carbondale, for respondent Sotero Agoot.

JUSTICE WELCH delivered the opinion of the court:

Petitioner, Freeman United Coal Mining Company (hereinafter Freeman), appeals from a decision of the Human Rights Commission finding that complainant, Sotero Agoot, had established a *prima facie* case of national origin discrimination and that Freeman's articulated nondiscriminatory reason for terminating Agoot's employment was pretextual. We reverse the decision of the Human Rights Commission for the reason that its finding of pretext is against the manifest weight of the evidence.

Sotero Agoot, born and raised in Hawaii, is of Japanese-Philippino ancestry. He is officially classified as an Asian-Pacific Islander. After graduation from high school, Agoot entered the military service, where he was trained as an electronic technician and electronic technician instructor. He first became employed by Freeman United Coal Mining Company on January 8, 1971, as an underground repairman at Freeman's Orient No. 3 underground coal mine near Waltonville, Illinois. As such, he was responsible for maintaining and repairing all the electric components of Freeman's underground equipment. He remained an underground repairman for three years, when he became a "top" electrician. As a top electrician, he was responsible for the maintenance and repair of Freeman's aboveground electrical equipment.

In May 1976, Agoot was promoted to the position of maintenance foreman, a salaried supervisory position. In order to be employed as a maintenance foreman, Agoot was required to obtain certain State and Federal certificates. Agoot not only had the three required certificates, but also obtained two additional certificates. There is no question that Agoot was highly technically qualified for the position of maintenance foreman.

Agoot also served for a time as a maintenance foreman shift leader. As such, he was responsible for supervising not only the 20 hourly employees on the shift, but also the other 12 maintenance foremen on his shift. Agoot was a shift leader from the spring of 1979 until approximately January 1982.

Adverse market conditions caused a reduction in force at Orient No. 3 mine in March 1982, and the mine was permanently closed in December 1982. As part of the March reduction in force, 10 of approximately 24 maintenance foremen at Orient No. 3 were laid off. Agoot was among those laid off. Of those laid off, Agoot was the only minority member. Of those retained in March 1982, one minority member, Don Cruz (Hispanic), was retained. Also employed at Orient No. 3 as assistant to the mine supervisor was David Weaver, an Asian-Pacific Islander. Agoot, Cruz and Weaver were the only salaried

minority employees at Orient No. 3 in March 1982.

Agoot's immediate supervisor at Orient No. 3 was Dennis Robbins, the assistant maintenance chief at No. 2 portal. (Orient No. 3 had two operating portals, each of which had its own assistant maintenance chief and maintenance staffs.) Robbins' supervisor was Ralph Shockley, maintenance chief of the entire mine. Shockley's supervisor was Kenneth Barker, maintenance superintendent for all Freeman underground mines. George Higgins, mine superintendent of Orient No. 3, had supervisory responsibility for all personnel working at the Orient No. 3 mine.

According to Agoot's supervisors, Agoot had continuing and serious problems complying with certain company policies. In 1979, Freeman instituted a new preventive maintenance program designed to eliminate or reduce costly "down time" for machinery. This program was very important to Freeman. A meeting was held with all the maintenance foremen and the preventive maintenance program was explained to them in detail. Pursuant to the program, maintenance foremen were responsible for conducting regular maintenance checks on machinery and keeping regular records of the preventive maintenance work done. The records were turned in on a weekly basis by the foremen to maintenance chief Ralph Shockley.

Also in 1979, as part of the preventive maintenance program, a "call-out" procedure was instituted. This required all underground maintenance foremen to call in their location in the mine every hour so that the maintenance crew nearest to a breakdown could be quickly and easily located. It was also used to prevent some maintenance foremen from making themselves "unavailable" when a breakdown occurred.

Ralph Shockley described Agoot as very competent in his technical abilities. However, Agoot had trouble complying with the preventive maintenance program. Agoot did not regularly turn in his weekly records of maintenance checks, and those that were turned in were incomplete or unsatisfactory. Agoot also failed to comply with the call-out procedure. Shockley spoke with Agoot on at least two occasions with respect to his deficiencies in this area. Shockley did not find it necessary to have these types of discussions with every other maintenance foreman, and Agoot's compliance with the preventive maintenance program was worse than some of the other maintenance foremen. Shockley also stated that Agoot was demoted from shift leader in January 1982 because of his lack of cooperation with the preventive maintenance program.

Shockley testified that he was involved in the decision to lay off

maintenance foremen in March 1982. Among the criteria used in determining whom to lay off were technical abilities and cooperation with the preventive maintenance program. Also involved in the decision of whom to lay off were Kenneth Barker, George Higgins, Dennis Robbins and Charlie Fields, the preventive maintenance analyst. Agoot was chosen for layoff because of his lack of cooperation with the preventive maintenance program. In addition to Agoot, two white maintenance foremen who failed to comply with the preventive maintenance program were also laid off in March 1982. Maintenance foreman Jerry Clark, a white man, had been discharged in 1980 for his failure to comply with the preventive maintenance program.

Dennis Robbins corroborated the testimony of Ralph Shockley in all material respects. He further testified that Agoot was quite vocal about his dislike for the preventive maintenance program. Robbins characterized Agoot's cooperation with his superiors as poor and testified that Agoot defied authority. He stated that although Agoot was good at motivating the men under him, he did not always motivate them in the direction his supervisors would have liked. At the time of the March 1982 layoff, Robbins was asked to recommend the maintenance foremen to be retained. Agoot was not among those he recommended because of Agoot's bad attitude and lack of support for company policies.

Kenneth Barker also corroborated the testimony of Shockley in all material respects. He further testified that he spoke with Agoot about his lack of compliance with the preventive maintenance program on three occasions. Present at the first two meetings were Ralph Shockley, Dennis Robbins and Charlie Fields, the preventive maintenance analyst. Agoot was told that his performance and attitude were not satisfactory. Agoot expressed that he thought the program was a "bunch of crap," but that he would try to comply. Agoot was also told that if he did not begin to comply, his job might be in jeopardy. The third meeting was in mine superintendent George Higgins' office; Ralph Shockley was also present. Higgins tried to impress upon Agoot the importance of complying with the preventive maintenance program. Referring to the call-out procedure, Agoot told Barker that he did not agree with his "snitch sheet."

When the layoff decision was made in March 1982, Barker instructed Shockley to rank the maintenance foremen in terms of overall job performance, technical ability, compliance with company policy and ability to get along with other employees. Shockley recommended that Agoot be one of those to be laid off. Barker agreed with this recommendation.

Donald Dame testified that he was manager of training for Freeman from 1979 until the time of the March 1982 lay off. In 1979, Freeman implemented a job knowledge program designed to increase salaried employees' knowledge with respect to their jobs. Employees, including maintenance foremen at Orient No. 3, were required to attend a certain number of two-hour seminars, for which they were paid. Agoot had a number of unexcused absences from these seminars and had the worst attendance record in the program. Dame found it necessary to telephone mine superintendent George Higgins about Agoot's lack of attendance. This was not necessary with respect to any other employee. Agoot acknowledged that he had met with Higgins with regard to his absences from these seminars. Once, while in the mine, Dame overheard Agoot state to several other employees of the mine that he was not going to comply with the call-out program, which Agoot characterized as a "snitch sheet."

Sotero Agoot testified that, other than one time in November 1979, he was never disciplined or reprimanded, either orally or in writing, nor was he ever counseled by his superiors with regard to any deficiencies in his performance or attitude. He stated that he had an excellent relationship with the men he supervised. Agoot admitted that in November 1979, while he was a shift leader, he met with Kenneth Barker, Charlie Fields, Ralph Shockley and Dennis Robbins with respect to Agoot's refusal to comply with the preventive maintenance program. Agoot told his superiors at this meeting that he had not refused to comply with the program and that he had in fact been complying with it. He stated that after the meeting, his superiors concluded that Agoot had been complying with the program. Agoot testified that, other than Norman Burgess, he was a better maintenance foreman in all respects than the maintenance foremen who were retained at the time he was laid off.

Agoot also testified that during almost three years in which he was shift leader, he was never counseled by his superiors concerning any deficiencies in his work, he was never reprimanded either orally or in writing for safety violations, and that he got along excellently with the men he supervised. Agoot testified that when he was removed as shift leader, he was not told that it was because he was not doing his job. Agoot stated that on two occasions, he was asked to train other new maintenance foremen. Agoot also testified that in 1979 he was offered the opportunity of becoming either an instructor or a preventive maintenance analyst, and that at one time he had been considered for the position of maintenance chief at Orient No. 3.

Finally, Agoot testified that management employees at the mine

often made reference to Agoot's national origin in what he characterized as a derogatory manner. For example, Harry Racine, assistant mine manager for No. 2 portal at Orient No. 3 made reference to Agoot's national origin on a daily basis in the last three years of Agoot's employment. This sometimes occurred in the presence of people whom Agoot supervised and also in the presence of Racine's immediate superior. Racine often made statements to the effect that he wished he had been a better shot during the Second World War and had killed Agoot's grandfather so that he would not have had to contend with Agoot. Agoot asked Racine to stop making such remarks but the remarks only got worse.

Mr. Bullock, another assistant mine manager, echoed Racine's comments and also called Agoot a "little Chink" and "fish heads and rice." Agoot asked Bullock to refrain from such comments but the comments continued, even in the presence of men whom Agoot supervised. Another assistant mine manager, Stan Pszyka, regularly and often between 1980 and 1982 referred to Agoot as "Little Chinaman" and "pineapple head." He ignored Agoot's requests that he stop making such comments. Danny Fowler, the assistant maintenance chief at No. 3 portal referred to Agoot on occasion as "Chiney." Other assistant mine managers referred to Agoot as "Hopsing," "rickshaw driver," "Little Chink," and "Little Jap." Such comments were often made in the presence of the men whom Agoot supervised. Sometimes such nicknames were broadcast over the underground pager, a loudspeaker used for paging underground miners.

Agoot asked his superiors to stop making such comments, but to no avail. Agoot testified that he complained to mine superintendent George Higgins about the comments but Higgins took no action.

Sometime prior to November 1979, Kenneth Barker, maintenance chief, walked into a meeting with Agoot, Ralph Shockley, Dennis Robbins and Mr. Willmore and said, "Good morning, men, you too Agoot." Also in 1979, Barker made a comment to the effect that if a piece of solid state equipment broke down, they should "call Agoot, his people invented it." Agoot thought that Shockley and Robbins were present when this comment was made.

In response to Agoot's statement, "Well Mr. Higgins, you're still here," mine superintendent George Higgins stated, "Yes, I'm still here, I'll still be here long after you're gone, you little black bastard."

Agoot stated that he usually asked people to stop making such comments. Agoot's testimony in this regard was corroborated by that of other witnesses.

Apparently this type of name calling was quite common in the un-

derground mine. Some of the nicknames used in Orient No. 3 were Jose, Gomer, Strawberry, Beachball, Oink, and Pizzahead. Agoot admitted that he referred to his fellow workers by such names as "Oink" and "Beachball." Agoot also admitted that on occasion he called Don Cruz, a man of Hispanic ancestry, "Jose." Agoot admitted that he often joked about his national origin with his fellow workers, although he stated that he did this as a defense. Dennis Robbins testified that such comments and name calling were common practice in the mine and that he was even subject to such comments. He further testified that such comments were made on a friendly basis and not in a nasty or derogatory manner. Mine superintendent George Higgins testified that he did not attempt to stop such name calling.

Agoot introduced evidence that when Orient No. 3 closed in December 1982, several maintenance foremen were transferred to other Freeman mines. Mark Cook, one of the maintenance foremen who was transferred to another Freeman mine, testified that Agoot was a good maintenance foreman and was at least as good as the maintenance foremen who were retained in the March 1982 layoff. However, he also testified that Agoot had problems cooperating with the preventive maintenance program and that he failed to complete the required records. Cook was still employed as a maintenance foreman with Freeman at the time he testified. John Willmore, who was a maintenance foreman at Orient No. 3 at the same time as Agoot, testified that Agoot was an excellent maintenance foreman and was better than most of the maintenance foremen who were retained in the March 1982 layoff. Willmore had been included in the March layoff. Charlie Meadows, who worked as a machine operator and later a repairman while Agoot was maintenance foreman, testified that Agoot was an excellent maintenance foreman and was better than the other maintenance foremen with whom Meadows worked. Janet McKinney was a repairwoman who worked under Agoot. She testified that Agoot was a good boss and was a better boss than the other maintenance foremen under whom she worked. James Flener testified that he worked with Agoot as a continuous mine operator, repairman and as a union safety committeeman. He testified that Agoot was a better maintenance foreman in all respects than the other maintenance foremen with whom he worked.

A.J. Burgess testified that he worked in the parts shop while Agoot was maintenance foreman. He was the individual to whom maintenance foremen were to report pursuant to the call out procedure. He was asked if he "ever had any problems with Sotero Agoot failing to call you?" He responded, "I can't remember ever having

any trouble with Agoot. No, I never had any trouble with Agoot. He was the most polite boss I had." Louis Bochantin also worked in the parts shop and received calls from maintenance foremen. He testified that Agoot "called in good" and that he had no difficulty locating Agoot when necessary.

Although Freeman introduced a great deal of testimony as to Agoot's deficiencies, it was unable to present any documentary evidence to support the testimony. The preventive maintenance program records were not produced at trial to show Agoot's deficiencies. Apparently there were no written criteria used in making the decision of whom to lay off in March 1982.

■■ ■ A claim of discrimination under the Human Rights Act must be examined in the same fashion as one brought pursuant to Title VII of the Civil Rights Act of 1964. (*Board of Education of Waterloo Community Unit School District No. 5 v. Human Rights Comm'n* (1985), 135 Ill. App. 3d 206, 209, 481 N.E.2d 994, 996.) This three-step analysis requires first that the complainant prove a *prima facie* case of discrimination by showing (1) that he is a member of a class protected by the Human Rights Act; (2) that he was performing satisfactorily in his job; (3) that he suffered an adverse employment action; and (4) that similarly situated members of the unprotected class did not suffer the same adverse action. Once the complainant has established a *prima facie* case of discrimination, defendant then has the burden of articulating a legitimate and nondiscriminatory reason for its actions. Once the defendant has done so, the burden then shifts back to the complainant to prove that the defendant's stated reason is in fact a pretext for discrimination. Pretext may be shown either through direct evidence that a discriminatory reason more likely motivated the employer, or through indirect evidence showing that the employer's articulated reason is unworthy of belief. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the complainant remains at all times on the complainant. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 67 L. Ed. 2d 207, 215, 101 S. Ct. 1089, 1093.

■ When reviewing a decision of the Human Rights Commission, a court should sustain the Commission's findings of fact as *prima facie* true and correct unless they are contrary to the manifest weight of the evidence. (*K mart Corp. v. Human Rights Comm'n* (1984), 129 Ill. App. 3d 842, 845, 473 N.E.2d 73, 75.) A finding is against the manifest weight of the evidence if an opposite conclusion is clearly ev-

ident. *Burke v. Board of Review* (1985), 132 Ill. App. 3d 1094, 1100, 477 N.E.2d 1351, 1356.

■ The Commission's finding that Agoot had established a *prima facie* case of discrimination through indirect evidence that he was doing an adequate job for Freeman, that he was laid off and that other similarly situated white employees did not suffer the same adverse employment action is not against the manifest weight of the evidence. The parties agree that Freeman articulated a legitimate, nondiscriminatory reason for its layoff of Agoot. However, we reverse the order and decision of the Commission because its finding that Freeman's articulated reason was a pretext for discrimination is against the manifest weight of the evidence.

■ Freeman's articulated reason for choosing Agoot for the layoff was that he had the worst record of compliance with the preventive maintenance program. The Commission found, however, that Freeman had a problem with all of its maintenance foremen with respect to compliance with the preventive maintenance program. Therefore, singling out Agoot appeared pretextual. The Commission's finding in this regard is against the manifest weight of the evidence. Although Ralph Shockley testified that on occasion he had complaints about all of the maintenance foremen, and Dennis Robbins testified that he had problems with all of the maintenance foremen at one time or another, Shockley also testified that he did not find it necessary to have individual meetings with all of the maintenance foremen regarding compliance with the preventive maintenance program, as he did with Agoot. There is no evidence that any other maintenance foreman was as uncooperative with the program as was Agoot, and no evidence that any foreman who was retained in March 1982 had as serious a problem complying with the program as did Agoot. To the contrary, the evidence shows that other white employees who had serious problems complying with the preventive maintenance program also suffered adverse employment actions. Jerry Clark was discharged prior to the layoff for failing to support the preventive maintenance program. John Willmore and Jim Fitzpatrick were included in the March 1982 layoff in part because of their failure to comply with the preventive maintenance program. These three, in addition to Agoot, were the only maintenance foremen whom Ralph Shockley could specifically recall had serious problems complying with the preventive maintenance program. Thus, it appears that the preventive maintenance program was uniformly enforced and that a foreman's compliance therewith bore a direct relationship to his fate in the March 1982 layoff. Because Agoot apparently had the worst record with respect

to compliance with the preventive maintenance program, and because others who had similar problems also suffered adverse employment actions, including Agoot in the layoff for this reason is not pretextual.

The Commission also found that Agoot did comply with the call-out procedure. The Commission based this finding on the testimony of A.J. Burgess and Louis Bochantin that they had no problem with Agoot's compliance with the call-out procedure. These individuals were hourly, nonmanagement employees of Freeman who were not responsible for overseeing compliance with the call-out procedure, but were only charged with the duty of logging in the calls when they were made. Burgess merely testified that Agoot was polite when he called in. Bochantin testified that Agoot "called in good" and was not difficult to locate. This testimony is not sufficient to establish that Agoot complied with the call-out procedure in light of the testimony of Ralph Shockley, Dennis Robbins and Kenneth Barker, all of whom were directly involved in overseeing compliance with the preventive maintenance program, and all of whom testified that Agoot had serious problems complying with the call-out procedure.

■ Finally, the Commission found that "the heated and hostile remarks directed toward" Agoot and the "atmosphere of utter hostility toward" Agoot, together with the lack of any "written, objective criteria for layoff" made the layoff decision "highly suspect," leading to a reasonable inference that Agoot's national origin played some role in the layoff decision. The Commission's finding that heated and hostile remarks were directed toward Agoot and that Agoot worked in an atmosphere of utter hostility is not supported by the evidence. Instead, the evidence indicates that Agoot was well-liked by those with whom he worked. The evidence indicates that the remarks regarding Agoot's ancestry were not directed toward him in a heated and hostile manner, but rather were quite common in the coal mine with respect to all the workers and were meant in a joking and friendly, rather than insulting, way. While we do not condone the use of racial slurs, we do not think the evidence supports the finding that the environment at Freeman, even when coupled with the lack of any written criteria for making the layoff decision, leads to the reasonable inference that Agoot's national origin played some role in the layoff decision.

■ The Commission apparently found the articulated reason of Freeman to be unworthy of belief. We find nothing in the record to support this finding. Support of a company's policies and procedures, especially one as important as Freeman's preventive maintenance program, is a legitimate concern in an employment decision. The record

is replete with evidence of Agoot's refusal to comply with this program and of his vocal opposition to the program, sounded to both his superiors and to the men he supervised. The record shows that Agoot's attitude and lack of compliance with the program were much worse than any of the maintenance foremen who were retained in the March 1982 layoff. That the men whom Agoot supervised thought he was a good boss or that Agoot was highly technically qualified does not discredit the evidence that he failed to cooperate with the preventive maintenance program.

It must also be remembered that Freeman was undergoing a 50% reduction in force. Although Agoot might not have been terminated otherwise, it is undisputed that some maintenance foremen had to go. The question is whether Agoot was included in the layoff because of his national origin or because he was not doing as good a job as maintenance foremen who were not laid off. The burden of proving discrimination at all times remains on the complainant. Agoot has not carried this burden.

Finally, the Commission found that because Freeman did not produce documentary evidence to support its claim that Agoot's compliance with the preventive maintenance program was worse than that of white maintenance foremen who were not included in the March 1982 layoff, it failed to rebut Agoot's showing of pretext. However, because Agoot did not establish by a preponderance of the evidence that Freeman's articulated reason was a pretext for discrimination, there was no need for Freeman to introduce any documentary rebuttal evidence.

The finding of the Human Rights Commission that Freeman's articulated nondiscriminatory reason for including Agoot in its layoff is against the manifest weight of the evidence. Therefore, we reverse the order and decision of the Human Rights Commission.

Reversed.

HARRISON, P.J., and LEWIS, J., concur.