ACORN CORRUGATED BOX COMPANY, Petitioner, v. THE ILLINOIS HUMAN RIGHTS COMMISSION *et al.,* Respondents (Dick Gaylord, Cross-Petitioner; The Human Rights Commission *et al.,* Cross-Respondents).

First District (4th Division)   No. 1—87—1319

Opinion filed March 23, 1989.—Rehearing denied April 19, 1989.

Donald Peters, Jr., and Arvey, Hodes, Costello & Burman, both of Chicago (Fred R. Kimmel, of counsel), for Acorn Corrugated Box Company.

Kinoy, Taren, Geraghty & Potter, P.C., of Chicago (James R. Potter, of counsel), for Dick Gaylord.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Jill A. Deutsch, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

JUSTICE McMORROW delivered the opinion of the court:

Acorn Corrugated Box Company (Acorn) appeals directly to this court from that portion of the order of the Illinois Human Rights Commission (Commission) adopting the recommended order of the administrative law judge (ALJ) finding that complainant, Dick Gaylord (Gaylord), was discharged from his employment with Acorn because of his race. Gaylord cross-appeals from that portion of the Commission's order which reversed the ALJ's finding of handicap discrimination. Following a careful examination of the nine-volume record in its entirety, we affirm that portion of the Commission's order dismissing his claim of handicap discrimination but reverse the Commission's finding of race discrimination on the ground that it was contrary to the manifest weight of the evidence.

BACKGROUND

The record reveals that Acorn, a manufacturer of corrugated boxes, employed Gaylord, a black man, from July 1960 to March 10, 1982, when he was formally discharged. On March 4, 1982, Gaylord was placed on an indefinite suspension pending investigation of an incident of insubordination toward his supervisor, Michael Tallon. Later that afternoon, Gaylord submitted a grievance form in which he detailed the events leading to the suspension. On March 8, a union grievance meeting was held, and on March 10, Gaylord was given written notice of his discharge. On that same day, Gaylord filed an employment discrimination claim with the Illinois Department of Human Rights alleging that he was suspended on the bases of race, physical handicap and retaliation for having filed prior discrimination complaints against Acorn. On April 17, a labor arbitration hearing, at which Gaylord was represented by counsel and a union representative, was held on the circumstances of Gaylord's discharge. The arbitrator entered an award in Acorn's favor, finding, *inter alia*, that the evidence established that Gaylord's defiance of a direct order of his supervisor was "the zenith" of an insubordinate attitude which had developed during his long tenure with Acorn, and that his insubordination had "reached the stage where Acorn had every rea-

son to discharge him." On August 15, 1982, the Illinois Department of Human Rights also dismissed Gaylord's claim against Acorn on the basis of a lack of evidence to support Gaylord's claim. However, following a request for review by Gaylord, a Commission panel reinstated his claim on March 5, 1983, and on April 27, 1984, the Commission issued a complaint charging that Acorn had discharged Gaylord on the bases of race and physical handicap in violation of his civil rights. In its answer of May 23, 1984, Acorn denied that Gaylord was discharged for the reasons alleged; rather, Acorn asserted, Gaylord was fired because of the incident of insubordination on March 4, 1982, coupled with an unsatisfactory disciplinary history.

A public hearing was held before ALJ Sandra Y. Jones on October 30, October 31 and November 13, 1984. The evidence adduced at that hearing is as follows.

Dr. Donald Misch testified that at the request of Gaylord's attorney, he examined Gaylord in late 1982 and again in late September 1984. Based on the medical history provided to him by Gaylord, the X rays taken and his own examination of Gaylord, it was his opinion that Gaylord suffered from a condition consistent with a diagnosis of emphysema, chronic bronchitis and bronchiectasis. His recommendations for the treatment and control of the condition were that Gaylord take medication and avoid activities, including smoking, which involved the inhalation of pollutants, toxins, dust and dirt. Dr. Misch acknowledged on cross-examination that Gaylord admitted to him that he smokes cigars and cigarettes.

Gaylord testified that he had been receiving disability benefits from the Veterans Administration since 1957 for a military service-connected condition diagnosed as bronchiectasis. However, he did not inform anyone at Acorn of his condition when he applied or was physically examined for employment in 1960, nor at any time prior to March 4, 1982. Gaylord had been a union steward for approximately 16 of the 22 years he was employed by Acorn.

In March 1982, his job was to drive a battery-operated forklift called a corrugated jeep on the third shift, which began at 11 p.m. and ended at 7 a.m. His primary responsibility was to move loads of corrugated material within the plant. Sometime in February 1982, Edward Monaco, a fellow employee, asked Gaylord if he was planning to quit his job. Monaco explained that Michael Tallon, the third-shift superintendent, had asked him (Monaco) if he would be interested in Gaylord's job.

Shortly after he reported for work on the night of March 3, 1982, Tallon informed him that the corrugator, the machine which produces

the boxes, would be shut down at about 3 a.m., following which there was to be a general plant cleanup. Tallon gave him the option of leaving the plant early without penalty but Gaylord declined, stating that he preferred to stay to complete his work. In accordance with Tallon's instructions, he took his lunch break at 3 a.m. and then began his usual cleanup tasks. Shortly after 4 a.m., Tallon drove his scooter to where Gaylord was working, stopped and said that he had another job for Gaylord to do. Before stating what that job was, Tallon was paged over the plant loudspeaker and left to answer a telephone call. A short time later, Tallon returned with Robert Kalnes, the third-shift maintenance supervisor, and told Gaylord to come to his office. Once inside, Tallon repeated that he had another job for him to do but, again, failed to explain what it was. In response to Gaylord's direct question, Tallon said that he wanted Gaylord to work in the battery area, a section of the factory where the jeep batteries are stored and serviced. Gaylord explained to Tallon that he was not refusing a job but he could not work in that area because it contained sulfuric acid fumes and dust which aggravated his bronchial condition. He also requested that a safety man be called in to hear what he had to say, but Tallon refused the request, saying that a safety man "wasn't necessary" and that he "wasn't interested [in Gaylord's health problems]." Gaylord then requested permission to go home since he wasn't "being allowed to complete his work as agreed." Tallon denied such permission, repeating that he wanted Gaylord to work in the battery area. Gaylord reiterated both his explanation that he could not work there because of his health problem and his request that a safety man be called in to the meeting. Tallon said "forget it" and told Gaylord that he was suspended until further notice and that he (Tallon) and Kalnes would escort Gaylord to the plant time clock to ensure that Gaylord followed his directive to promptly punch his time card and leave the plant. When he arrived at the time clock, Tallon was there with Gaylord's time card in hand. As soon as Gaylord punched the card, Tallon took it from him, held it up, smiled and said, "I have what I want."

At approximately 5:30 a.m. Gaylord went home and prepared a grievance form, which he delivered to the union hall the following day. In his 16 years as a union steward he had drafted many grievance forms. Since the purpose of the form is merely to initiate the grievance procedure, he did not detail all the events of, or leading to, the meeting with Tallon and Kalnes. He did, however, tell Wardell Harris, a union representative, what had occurred and that he had declined to work in the battery area because such work posed a hazard to his health.

Gaylord further testified that Steve Crenshaw, the plant "miscellaneous man" or "general helper," was the person generally responsible for checking and servicing the batteries and for cleaning the battery area. Although Gaylord took his jeep into the battery area at the beginning of each shift to have it checked and, if necessary, serviced, he always waited outside the area while the work was being completed. He had not objected when, on previous occasions, Tallon had instructed him to clean areas other than the battery area. Having learned a few weeks earlier that Tallon had asked if Monaco was interested in Gaylord's job, he testified that he felt it was particularly important to agree to perform whatever nonhazardous duties were assigned to him.

On March 8, 1982, Gaylord, Kalnes, Raymond Jachim, the personnel manager and safety director, and J.C. Rogers, a fellow employee and the union shop chairman, met to discuss his grievance. After he (Gaylord) explained what had occurred on the night of March 4, Jachim asked whether he had informed Tallon that he had proof of his bronchial condition. He attempted to tell Jachim that he had a document from the Veterans Administration verifying the condition but Jachim then said that he wasn't interested in what Gaylord had to say about his health. Although he presented a document he received when he was discharged from a military hospital in 1956, it was ignored.

On March 10, 1982, he received the letter from Jachim informing him of his immediate discharge. On March 17, another meeting was held at Acorn's personnel office. In addition to those present at the March 8 meeting were union representative Wardell Harris and Michael Tallon. Gaylord asked that Kalnes not be permitted to "testify" against him because Kalnes had once been heard referring to a black supervisor as a "nigger."

On cross-examination Gaylord stated that the sole reason he refused to follow Tallon's order was to protect his health. He acknowledged, however, that in the two-page grievance he prepared a few hours after the incident, he did not mention that he had a bronchial condition or other health problem or that he told Tallon that health considerations prevented him from performing the job Tallon assigned to him. He also admitted that when he was asked at the arbitration hearing whether he told Tallon that he had a bronchial problem that his response was, "No—well, the foreman stated that he was not interested as far as my health was concerned ***." He also stated that the first time he presented verification of his medical condition was at the meeting of March 8, 1982.

Michael Tallon testified that he had worked for another container

company for 23 years before being hired as a foreman at Acorn in 1979. The plant is not fully operational on the third shift and is manned by approximately 14 employees, including Robert Kalnes, supervisor of the three- or four-man maintenance crew. The main function of the third shift is operation of the corrugator. Although "the miscellaneous man," Steve Crenshaw, was the person usually responsible for servicing the jeep batteries and for general cleanup duties on the third shift, there were occasions when workers from the corrugator department were assigned various maintenance and cleaning tasks.

When he arrived at work on the night of March 3, 1982, the second-shift superintendent instructed him to shut down the corrugator for cleaning at 3 a.m. and then conduct a general plant cleanup. He advised the employees of the agenda and stated that because of the lack of work, anyone who wished to leave could do so without incurring attendance "penalty points." He determined which areas required cleaning by driving around the plant on his scooter. Cleaning of the battery area was normally left for the third shift. Steve Crenshaw was present at work that night. In the course of his inspection, Tallon noted that the conveyor area on the west end of the plant near the press department and shipping room was in need of cleaning. Approximately mid-way through the shift, he began to assign specific cleaning tasks to all of the employees present. At approximately 4 a.m. Gaylord was operating his electric forklift to move empty skids from out of the aisles in the baling area. Tallon drove his scooter to where Gaylord was working and told him that he wanted him to sweep and clean the area from the small flexo machine to the shipping room. Gaylord responded loudly that he wanted to finish stacking the skids. Tallon replied that additional stacking was not necessary and that he wanted Gaylord to do what was asked of him. At that point, Tallon received a call on the loudspeaker regarding cars parked in an area scheduled for snow plowing and, after telling Gaylord that he would "get back to [him]," he left. When he encountered Bob Kalnes near the factory exit he asked him to sit in on a meeting he planned to have with Gaylord in the superintendent's office. Tallon then returned to the baling area and told Gaylord that he wanted to speak with him in the office. As the three men were entering the office, Gaylord loudly said, "I don't need you to lead me into the office like a schoolboy." After everyone was seated, Tallon began to explain to Gaylord what he expected Gaylord to do but Gaylord would not allow him to speak. Gaylord alternately stood and sat and moved his arms about and repeatedly stated that he wanted to finish "his job."

Each time Tallon began to speak, Gaylord spoke louder. Gaylord argued that the skids should be moved as a safety measure and asked that a safety man be brought in to the meeting. Tallon responded that he had inspected the area and determined that there was no safety problem because no skids were in the aisles. After repeated attempts to reason with Gaylord, Tallon gave him a direct order to sweep the area he had described earlier. At that point, Gaylord stood up and faced the wall with his back to Tallon. Tallon then told Gaylord that he had no choice but to suspend him. At no time did he ever direct Gaylord to sweep, clean or perform any duties in the battery area, which had been cleaned earlier in the shift; nor did Gaylord say anything about a physical condition or handicap which would be aggravated by his performance of the assigned work.

As he and Kalnes were getting on their scooters after the meeting, Gaylord turned and said, "I don't need you to follow me." Tallon denied that he was and proceeded in the opposite direction to the time clock as Gaylord returned to the plant. When Gaylord arrived at the time clock, he told Tallon not to touch his time card. Tallon explained that he was responsible for ensuring that Gaylord followed his directive to "punch out" and leave the plant. He reported the incident to Ray Jachim shortly before 7 o'clock that morning.

On cross-examination, Tallon stated that he did not specify what job he had assigned to Gaylord while they were in the meeting, and that it was only when he was asked by Kalnes afterward that he stated that the job was to sweep near the conveyor. He acknowledged that in his report of the incident, he wrote, "[I]t seemed that Dick Gaylord didn't understand the job I wanted him to do," but he added that his numerous attempts to clarify the assignment were frustrated by Gaylord's repeated interruptions and his loud and argumentative behavior. He was unaware of Kalnes having made any racial epithet in reference to a black supervisor.

Robert Kalnes' testimony regarding what had occurred during and after the meeting with Gaylord on March 4 was essentially the same as Tallon's. He further testified that he had no input into the decision to discharge Gaylord and he reiterated that nothing was said at the meeting by Gaylord about the battery area or Gaylord's health. Kalnes admitted that during a conversation with two employees he had referred to someone at the plant as a "lazy, black nigger." Reflected in Kalnes' notes of the meeting on March 8 was a remark by Gaylord that he did not feel that someone with 22 years' seniority should have to do cleanup work.

J.C. Rogers, an Acorn employee and a union steward since 1975,

testified that he was working on the second shift on the night of March 3, 1982. Because of the work slowdown that night, the second-shift employees were given the option of leaving early or staying to perform general cleanup duties. According to Rogers, the area Tallon claimed to have assigned Gaylord to sweep—under the conveyors from the flexo machine most of the way to the shipping department—had already been swept by him and other employees on the second shift. He recalled testifying at the arbitration hearing, however, that he had not cleaned the section from opposite the battery area to the shipping department. At the meeting of March 8, he asked Kalnes whether he knew what area Tallon had instructed Gaylord to clean. Kalnes replied that he did not know until after the meeting when Tallon told him that he wanted Gaylord to clean the battery area.

Cuber Thomas testified that he was working as a third-shift maintenance man on the night of March 4. He observed, at approximately 2:30 a.m., that the lights in the press department from next to the battery area to the west side of the building had been shut off, a common practice following the cleanup of an area. The lights over the aisles between the battery area and the press department, however, were still illuminated.

In the discharge letter of March 10, Jachim outlined the events of the incident on March 4 and the meeting on March 8. Jachim stated that Gaylord had "failed to establish good cause or reasons for his actions" in refusing Tallon's orders to sweep the area under the conveyors. Describing Gaylord's explanation that sweeping in the battery area would have constituted a health hazard as "unsatisfactory," Jachim noted that Gaylord had not been assigned to sweep that area; that March 8 was the first time that a health explanation was offered; and that the only reason given by Gaylord for his refusal at the time of the incident was that he was performing his own work and wanted to finish "his job."

Jachim also characterized Gaylord's work record as a "poor one" and stated that a review of his personnel records revealed a history of numerous violations of company rules for which he received several verbal and written warnings and a suspension. The letter went on to summarize 10 disciplinary incidents between October 1968 and March 11, 1981, six of which, Jachim noted, involved refusal or failure to follow directions or inattentiveness to job duties. Jachim recognized Gaylord's 22 years of employment but concluded that because of his "continued and repeated insubordination" and his failure to "correct [his] conduct," Acorn's only recourse was to terminate his employment.

Gaylord testified that he recalled most but not all of the incidents

referred to in the letter but that until March 10, 1982, he had received and was aware of only two warning letters having been placed in his file. Specifically, he testified that the first warning letter issued in October 1968 for insubordination concerned an occasion when he declined—as had two white employees, one of whom was Tallon—to leave the press department to work on the corrugator. A warning slip was issued to him but the superintendent told him that if he did not file a grievance, it would be destroyed. He did not learn until after his discharge that the warning had not been removed from his file.

With respect to a letter dated August 22, 1974, charging him with insubordination for refusing to follow a work order, it was his recollection that he had not directly refused an order, but that he had merely told the supervisor who asked him to move a load that his shift was ending five minutes later and to "get someone else." He did not recall receiving a copy of the letter contained in his file.

In 1975, he received a one-day suspension for parking in an unauthorized area close to the plant entrance on a day he was almost late for work. Gaylord acknowledged that the signator of the warning letter was Clarence Gipson, a black supervisor, but he stated that Jachim, not Gipson, sent him home that day.

The file also contained warning letters issued in February and April 1976 for violation of the company's safety regulation requiring employees to wear safety shoes. Gaylord testified that with respect to the February violation, he had his shoes with him but, in his haste, forgot to put them on before beginning his work. By the time Jachim called him to the office he was wearing the shoes, but Jachim nevertheless suspended him for the remainder of the shift. On the second occasion, he realized as soon as he arrived at work that he had left his shoes at home. In accordance with company rules, he immediately reported to his supervisor, Clarence Gipson, and was issued a set of safety toe clips, which was a common practice. There was no further discussion of the matter and he never received a copy of any written warning concerning it. Similarly, he had no knowledge that warnings had been issued for incidents in May 1976 and February 1977 when he briefly left his work station to make personal telephone calls.

He was aware that a warning letter had been placed in his file for his "lack of cooperation" and refusal to follow directions in connection with medical care provided by Acorn for a work-related injury. In a lengthy narration, he characterized the situation as one involving, essentially, unsatisfactory treatment by doctors at the medical clinic to which he was sent and a dispute between those doctors and his personal physician concerning his ability to return to work as well as

a dispute between him and Acorn regarding payment of the fees of his personal physician.

In July 1979, he received a warning letter and a three-day suspension for insubordination and being absent from work without authorized leave. He testified that in late June 1979, his wife was notified by telegram that her father, who lived in North Carolina, was seriously ill. As soon as he arrived for work that night, he showed the telegram to Tallon and Jachim and requested an emergency leave of absence, which was granted. When he told Jachim that he did not know how long he would be gone, in part because of gasoline shortages, Jachim responded, "[T]ry to call if you get a chance, but if not, don't worry about it." Upon his return the following weekend, he found a telegram at his home stating that he was suspended and that a decision had been made to discharge him unless he could explain his failure to call the company as he had been ordered to do. Following a meeting, at which he explained that he had been stranded without gas on the return trip, his conditional discharge was rescinded; however, the suspension was upheld on the ground that he had exceeded the allowable number of penalty points for absenteeism. He thereafter filed a claim with the Human Rights Department regarding the incident in which he charged Acorn with racial discrimination; but the claim was dismissed for lack of evidence.

The last violation cited in his discharge letter was a "final warning" letter issued after an incident on March 11, 1981, in which he was accused by Tallon and superintendent Mel Price of urinating on the plant floor. When he denied the allegation, Price said, "[W]ell, I don't have any proof, but if I catch you, you'll be terminated." It was his impression that the matter was then closed and he was unaware until after his discharge that a final warning letter had been placed in his file.

With respect to this last incident, Tallon testified that he was placing some materials on the banding line in the corrugator department when he noticed Gaylord standing 30 to 40 feet away with his hands on a load of boxes and his male organ exposed. He immediately reported what he had seen to superintendent Price, who is black. When he and Price returned to where Gaylord had been standing they found a puddle on the floor. Following a conversation with Gaylord in which he denied urinating on the floor, he (Tallon) wrote a report concerning what he had seen and submitted it to the personnel office.

Jachim also testified concerning some of the disciplinary actions enumerated in Gaylord's discharge letter. He denied that Gaylord had immediately informed his supervisor that he had forgotten his safety

shoes as is required by company policy and stated that the failure to wear safety shoes in the plant was considered a serious violation of company regulations. Regarding the 1979 suspension, Jachim testified that when Gaylord informed him of his intended plan to travel to North Carolina, he instructed Gaylord to call as soon as he arrived there to inform the company of the expected length of his stay and that his failure to call was the primary reason for the suspension. Jachim also stated that there were several unrecorded discussions between Gaylord and him in which he admonished Gaylord for his insubordination to supervisors and attempted to impress upon him the importance of following instructions and company regulations.

J.C. Rogers testified that during his 10 years as a union steward he attended as many as four grievance meetings each week. Between 1975 and 1982, approximately six white and 12 black employees had been suspended and approximately four whites and six blacks had been discharged. He did not recall any meetings at which an employee's prior disciplinary history was discussed in the same detail as was Gaylord's at the meeting of March 8, 1982.

Ray Jachim further testified that it is normal company practice to review an employee's entire work record before deciding whether to discharge him. In the six days between Gaylord's suspension and his discharge, Jachim had the opportunity to speak with Tallon and Kalnes, to obtain a written statement from Kalnes, to meet with Gaylord and Rogers and to review Gaylord's personnel file, which contained no reference to a respiratory problem. Gaylord's record of 10 instances of prior disciplinary action for conduct violative of company rules did serve as a basis for the decision to discharge him, and aside from some commendations for good attendance, there were no other mitigating factors in Gaylord's work record. Also participating in the termination decision were Tallon, the production and assistant production managers, and the president of Acorn. Following Gaylord's discharge, notice of his position was posted as required by the labor agreement. The job was ultimately awarded to Edward Monaco, a white employee who was most senior in the line of progression in the corrugator department.

Certain documents in the disciplinary files of white employees Richard Hard and Spiro Vardounitis were introduced into evidence by Gaylord as support for his allegation of disparity in the treatment of black and white employees by Acorn. These records established that in April 1982, Hard was issued a warning letter for insubordination following a confrontation between him and his supervisor concerning a work assignment which Hard refused to perform. However, accord-

ing to Jachim, Hard's record, in contrast to Gaylord's, contained only one other prior disciplinary warning—for negligently repairing a machine. He had reviewed Hard's record before determining the appropriate discipline but he did not mention the prior incident in the letter to Hard because it was only a warning letter, not a letter of discharge.

The records of Vardounitis consisted of five disciplinary matters. In January 1972, a notation was entered by Clarence Gipson regarding a confrontation between Vardounitis and another employee. Gipson noted that an investigation revealed that the incident was "a case of too much horseplay." Because the men agreed to shake hands and return to work, no disciplinary action was taken. The next incident arose out of Vardounitis' failure to timely return from a vacation in Greece. While in Greece, he sent a telegram stating that he was ill. One week later, on the date he was due back to work, his employment was terminated. Thereafter, Vardounitis sent another telegram stating that after recovering from his illness, he was married and that he would be returning to work in approximately two weeks. The decision to discharge him was rescinded following a meeting at which he presented medical evidence verifying the illness. A few weeks later, he received a written "reminder" signed by Gipson and Price that he had violated a plant regulation by failing to report to work on a designated Saturday, after promising a supervisor that he would work on that date. In March 1977, Vardounitis was issued a warning letter and was docked 15 minutes of pay for leaving his work station and causing a 10-minute curtailment of production. On November 3, 1977, Vardounitis received a final warning letter and a three-day suspension for leaving work without permission. The letter, written by Jachim, recited that after being told by the supervisor to call home concerning a message that his daughter was ill, Vardounitis punched his time card and left without informing the supervisor. Jachim noted that although the "usual disciplinary action" for such conduct is termination, the decision had been made on the basis of Vardounitis' good employment record to impose only a three-day suspension. Upon presentation by Vardounitis of proof that his daughter had ruptured her eardrum, the suspension was reduced to one day.

Acorn also submitted documents in support of its denial of Gaylord's discrimination charges. Among those documents were figures submitted to the Equal Opportunity Commission in 1983 representing that of the 152 plant employees, 43% were black; that 29% of the 21 supervisors were black and that each had been promoted from the rank and file; that during the two-year period preceding Gaylord's dis-

charge, only four, or 16%, of the 25 employees who had been discharged were black; and that of the two employees discharged for insubordination, one was black and the other was white. Acorn also produced letters of discharge which were sent to white employees Clint Curry and Daniel Paczynski in which their prior disciplinary histories were reviewed in the same manner as was Gaylord's in his termination notification.

Subsequent to the evidentiary hearing but before issuing a recommended order and decision, ALJ Jones left the employ of the Commission. Prior to her departure, however, she prepared a report of her factual findings, analysis, conclusions and recommendations, which she transmitted to ALJ Richard Gonzalez. After reviewing the transcripts and exhibits, ALJ Gonzalez issued an interim recommended order and decision "in accordance with the findings and analysis of Judge Jones." In that order, ALJ Gonzalez found that Gaylord had been the victim of race and handicap discrimination in violation of his civil rights and recommended that Acorn: (1) reinstate Gaylord to his prior or a comparable position; (2) reimburse Gaylord in an amount equal to all lost wages and benefits from March 4, 1982; (3) cease and desist from further discrimination; and (4) pay Gaylord reasonable attorney fees.

A three-member panel of the Commission thereafter held a hearing on Acorn's exceptions to the findings and recommendations of ALJs Jones and Gonzalez. On August 4, 1986, the Commission entered a final order and decision in which it adopted the ALJ's finding that Gaylord was discriminatorily discharged on the basis of his race but reversed the finding of handicap discrimination on the ground that it was contrary to the manifest weight of the evidence. Acorn appeals the Commission's finding of race discrimination and Gaylord appeals the Commission's dismissal of his claim of handicap discrimination.

OPINION
■■ The Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*) (the Act) declares that it is unlawful discrimination for an employer to discharge an employee on the basis of race or physical handicap (Ill. Rev. Stat. 1987, ch. 68, pars. 1—103(Q), 2—102(A)), and provides the mechanisms by which claims of discrimination are resolved. Section 8—106 of the Act provides for the designation of a hearing officer to conduct a hearing to determine whether the respondent has violated the civil rights of the complainant (Ill. Rev. Stat. 1987, ch. 68, par. 8—106(I)(1)). The hearing officer is then

required to submit to the Commission written findings and a recommended order for appropriate disposition of the claim (Ill. Rev. Stat. 1987, ch. 68, par. 8—106(I)(2)). Following the filing of exceptions and responses by the parties, a three-member panel of the Commission reviews the record and may adopt, modify or reverse, in whole or in part, the findings and recommendations of the hearing officer. (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E).) The Act directs the Commission to adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2)), that is, if the decision of the hearing officer is just and reasonable in light of the entire record (*Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138; *Davern v. Civil Service Comm'n* (1970), 47 Ill. 2d 469, 269 N.E.2d 713). Section 8—111 of the Act provides that in any judicial review of final orders of the Commission, the Commission's findings shall be sustained unless they are contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1987, ch. 68, par. 8—111; *Eastman Kodak Co. v. Fair Employment Practices Comm'n* (1981), 86 Ill. 2d 60, 426 N.E.2d 877), that is, that the final decision of the Commission must be just and reasonable in light of all the evidence presented (*Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138; *Thompson v. Board of Review, Illinois Department of Labor* (1983), 120 Ill. App. 3d 1, 457 N.E.2d 512). Under the Administrative Review Law, the scope of judicial review of administrative decisions extends to all questions of law and fact presented by the entire record (Ill. Rev. Stat. 1985, ch. 110, par. 3—110; *Smith v. Chicago Board of Education* (1988), 176 Ill. App. 3d 109); and although the court may not reweigh the evidence or substitute its judgment for that of the Commission (*Komarec v. Department of Labor* (1986), 144 Ill. App. 3d 1105, 494 N.E.2d 1257), the Commission's order must rest upon competent evidence and be supported by the record. Thus, the reviewing court has the duty to reverse an order which is either legally erroneous or factually against the manifest weight of the evidence. *Pepsi-Cola General Bottlers, Inc. v. Human Rights Comm'n* (1985), 137 Ill. App. 3d 288, 484 N.E.2d 538.

In reviewing employment discrimination cases under the Act, Illinois courts have followed the three-step analysis formulated by the Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, and *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089. Under that three-step approach, a complainant must first prove by a preponderance of the evidence a *prima facie* case of

discrimination which raises a rebuttable presumption that the employer unlawfully discriminated against him. Once the complainant has proven a *prima facie* case, the employer then has the burden of articulating a legitimate, nondiscriminatory reason for its action. If the employer carries its burden of production, the presumption of discrimination drops from the case. It is then incumbent upon the complainant to meet his continuing burden of proving by a preponderance of the evidence that the legitimate reason articulated by the employer was not its true reason but, rather, merely a pretext for discrimination. The ultimate burden of proving that the employer engaged in intentional discrimination remains at all times on the complainant. *Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *Freeman United Coal Mining Co. v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 965, 527 N.E.2d 1289; *St. Mary of Nazareth Hospital Center v. Curtis* (1987), 163 Ill. App. 3d 566, 516 N.E.2d 813; *Village of Oak Lawn v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115; *Department of Corrections v. Clay* (1985), 135 Ill. App. 3d 710, 481 N.E.2d 1080; *Freeman United Coal Mining Co. v. Fair Employment Practices Comm'n* (1983), 113 Ill. App. 3d 19, 446 N.E.2d 543.

We consider first Gaylord's contention that the Commission's dismissal of his handicap discrimination claim should be reversed. The elements of a *prima facie* case of discrimination may vary somewhat according to the nature of the claim made and the factual situation presented. *Turner v. Human Rights Comm'n* (1988), 177 Ill. App. 3d 476; *Valley Mould & Iron Co. v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 273, 478 N.E.2d 499; *Clark Oil & Refining Corp. v. Golden* (1983), 114 Ill. App. 3d 300, 448 N.E.2d 958.

■ To establish a *prima facie* case of handicap discrimination, the complainant must prove that he is handicapped within the definition of the Act; that his handicap is unrelated to his ability to perform the functions of the job he was hired to perform; and that an adverse job action was taken against him. *Caterpillar, Inc. v. Human Rights Comm'n* (1987), 154 Ill. App. 3d 424, 506 N.E.2d 1029; *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805.

■ Gaylord asserts that he established a *prima facie* case of handicap discrimination by showing that he is handicapped within the definition of the Act, that his handicap was unrelated to his ability to perform the functions of the job he was hired to perform, and that he was discharged because of the handicap. Gaylord also maintains that Acorn did not articulate a legitimate, nondiscriminatory reason to re-

but the presumption of discrimination based on his handicap and that the Commission's reliance on a single item of evidence, *i.e.*, the grievance form he prepared, to the exclusion of other probative evidence, rendered its decision contrary to the manifest weight of the evidence.

In support of his argument, Gaylord points to the evidence adduced at the hearing which, he claims, established that he suffered from bronchiectasis and had been receiving veteran's disability benefits for the condition for many years; that his handicap was unrelated to his ability to perform the normal job duties of a jeep driver, including general cleanup tasks; that the handicap only prevented him from performing tasks involving exposure to certain pollutants and toxins such as those present in the battery area; that the cleanup of the battery area was not one of his normal job duties; that although he informed his supervisor, Mike Tallon, of his handicap, Tallon said that he was not interested in his health; and that he was suspended and ultimately discharged for objecting, solely because of his health, to Tallon's order to clean the battery area. The ALJ found that Gaylord had established a *prima facie* case of handicap discrimination; that Acorn's articulated reason for discharging him was a pretext for handicap discrimination; and that he sustained his burden of proving by a preponderance of the evidence that he was discharged because of a physical handicap.

The Commission reversed this portion of the recommended order of the ALJ as being against the manifest weight of the evidence. There was no express finding by the Commission as to whether Gaylord had proven a *prima facie* case. However, we assume, from the absence of a contrary finding and from the Commission's discussion of the evidence, that the Commission accepted the ALJ's finding that Gaylord had established the existence of a handicap which was not related to his ability to perform his normal duties.

In reaching its determination, the Commission relied heavily on Gaylord's grievance of his suspension. As the Commission noted, the grievance was prepared by Gaylord a few hours after the incident and contained a typed narrative of the events of March 4, 1982. Notwithstanding Gaylord's testimony that it is not the purpose of a grievance form to provide a comprehensive statement of the events in question, the Commission found that Gaylord used it in "exactly that way." His detailed chronological account of the dispute with Tallon required attachment of a second page to the one-page form. In the document, Gaylord stated that he was performing a job earlier approved by Tallon when Tallon told him that he was being reassigned to a different job. He informed Tallon that he had not completed his own work but

Tallon said that he (Gaylord) was to do whatever job was given him. At that point, and again later at the meeting in the superintendent's office, Gaylord asked Tallon why Tallon was "refusing [him] the right to complete [his] work." Gaylord made no mention in the grievance that he suffered from any health problems or that he explained to Tallon that it was because of health considerations that he objected to a job reassignment. The Commission found that "on its face" the grievance showed that the "sum and substance" of the dispute "in the eyes of Gaylord as of March 4, 1982," was that he "was upset with [Tallon] for not allowing him to do the job he had first been assigned." The Commission found the absence of any reference to his health in the grievance to be compelling evidence rising to the level of "an admission by Gaylord that the incident had nothing whatsoever to do with any alleged lung disease." We agree.

Like the Commission, we are not persuaded by Gaylord's assertion that the reasons for the omission of any reference to his health problems were that the grievance form was hastily written to meet the 72-hour time requirement for its submission and that its purpose was merely to initiate the grievance procedure. In addition to the reasoning enunciated by the Commission, we note that Gaylord testified that he had been a union steward for nearly 16 years; that he had assisted in the preparation of numerous grievances during that period; and that he delivered a copy of the grievance to the union by the afternoon of the day of the incident. In our view, his admitted experience in the preparation and processing of grievances and prompt submission of the one relating to the incident at issue fatally undermines his explanation of his omission of critical facts which he later testified were the sole basis of his charge of handicap discrimination.

Other evidence presented also refutes Gaylord's charge that his handicap was a motivation for his discharge. For example, Gaylord admitted that he did not reveal in his application for employment, at his physical examination, or at any time prior to March 1982, that he suffered from a bronchial condition. Moreover, the physician called by Gaylord to confirm his medical condition testified that despite his recommendation that Gaylord avoid the inhalation of pollutants and toxins, Gaylord acknowledged that he smoked cigars and cigarettes.

Consistent with Gaylord's grievance and inconsistent with his testimony was the testimony of Tallon and Kalnes that the only reason given by Gaylord for his objection to a work reassignment was that he wanted to "finish his job." Thus, we conclude that the Commission correctly determined that the AJL's finding that Gaylord was discharged because of a physical handicap was contrary to the manifest

weight of the evidence.

We turn then to Acorn's contention that the order and decision of the Commission on Gaylord's claim of race discrimination should be reversed because the Commission's findings are contrary to the manifest weight of the evidence.

To satisfy the first prong of the three-step approach used in cases alleging discriminatory discharge, the complainant is generally required to show that he is a member of a racial minority; that he was satisfying the normal requirements of his work; that he was discharged; and that similarly situated nonminority employees were treated more favorably. (*St. Mary of Nazareth Hospital Center v. Curtis* (1987), 163 Ill. App. 3d 566, 516 N.E.2d 813; *Freeman United Coal Mining Co. v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 965, 527 N.E.2d 1289.) As in all discrimination cases, the employer must then produce a legitimate, nondiscriminatory reason for its action. If the employer carries its burden of production, the presumption of discrimination drops from the case and the complainant must prove by a preponderance of the evidence that the legitimate reason articulated by the employer was merely pretextual and that the employer discriminated against him because of his race. *Village of Oak Lawn v. Illinois Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115; *Burnham City Hospital v. Human Rights Comm'n* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635.

In the instant case, it is undisputed that Gaylord is a member of a racial minority and that he was discharged by Acorn from his employment as a jeep driver. However, there is considerable dispute as to whether his job performance was satisfactory and whether the white employees he used as comparatives were similarly situated but dissimilarly treated with respect to discipline for misconduct and violations of company rules. Acorn maintains that Gaylord is an "admitted wrongdoer"; that it presented evidence "distinguishing and explaining" the alleged disparate treatment of the white employees Gaylord used as comparatives; that the Commission misstated some and ignored other facts; and that its findings were not supported by the record.

In its order, the Commission stated that the work records of the two white employee comparatives were similar enough to Gaylord's to make a meaningful comparison and it was not against the manifest weight of the evidence for the ALJ to infer a racial animus based on the differences in treatment afforded Gaylord and his nonblack comparatives. The Commission further found that Acorn "articulated no reason for the disparative treatment other than its assertion that Gay-

lord's behavior warranted termination and that the nonblack individuals' behavior did not."

Having already presented a detailed summary of the evidence adduced at the hearing, we need not restate it here. We have considered it in its entirety, however, and find that the Commission's order adopting the ALJ's findings is not supported by that evidence in the record before us.

It was the Commission's finding, which we have affirmed herein, that Gaylord's objection to being reassigned from the job of moving and stacking skids to cleanup work had nothing to do with any alleged health problems. Rather, the evidence established that the basis of his objection to Tallon's directive to discontinue moving the skids was based on his unwarranted notion that he had a "right" to complete "his work." Furthermore, the incident was not limited to a single, spontaneous outburst, but was a course of loud, recalcitrant conduct which commenced on the floor of the factory and continued through the meeting in the superintendent's office and until Gaylord's ordered departure from the plant. As the Commission recognized in its reversal of the ALJ's finding of handicap discrimination, the suspension leading to Gaylord's discharge was imposed in response to conduct constituting unjustifiable insubordination.

The record also establishes that Gaylord's work records reflected 10 disciplinary incidents for violations of various company rules, including: unauthorized parking, failure to wear safety shoes, failure to secure permission for or to contact the company during a leave of absence, conducting personal business on company time, refusing to cooperate or follow directions in connection with medical treatment for a work injury, urinating on the plant floor, and two other incidents of insubordination based on his direct refusal to perform work assigned to him. Acorn also presented the uncontroverted testimony of personnel director Ray Jachim that, in addition to the written warnings issued to Gaylord, he (Jachim) had had several unrecorded discussions with Gaylord wherein he admonished Gaylord for his insubordinate attitude toward supervisors and attempted to impress upon him the importance of following their directions. In view thereof, we find, and the Commission did not deny, that Acorn's assertion that Gaylord had an unfavorable disciplinary history was amply supported by the evidence.

The remaining inquiry is, therefore, whether the work records of the white comparative employees were, in fact, sufficiently similar to Gaylord's so as to reasonably infer, as he claims, that in reaching its decision to discharge him, Acorn scrutinized his records much more

closely than it did those of white employees whose comparable transgressions were routinely overlooked. With respect thereto, it must be kept in mind that our task is not to review and make determinations on the propriety of each disciplinary action taken by Acorn for each individual's acts of misconduct. Rather, our function is to determine if the evidence supports the Commission's finding that Gaylord met his burden of proving, through the comparison of his record to those of white employees, that Acorn's asserted reason for firing him, *i.e.,* insubordination coupled with a poor work record, was merely a pretext for racial discrimination. Disciplining employees in different manners is probative of discrimination only if the employees are "similarly situated," which requires a showing of similar misconduct and similar work records. *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639.

Gaylord first presented evidence that Richard Hard had received a warning letter (and an attendant loss of four hours' pay) in April 1982 for insubordination following an incident in which he refused to grease some machinery as he was directed by the maintenance supervisor, Robert Kalnes. As Acorn points out, however, Hard's personnel file contained only one other disciplinary warning four years earlier—for improperly repairing a machine which resulted in additional damage to it. We find no valid basis for comparing Hard's one prior violation of a plant regulation relating to negligence to Gaylord's record of 10 violations, which included several instances of wilful misconduct and insubordination.

Neither, in our view, is the record of Spiro Vardounitis sufficiently similar in either the quantity or nature of misconduct recorded therein so as to serve as a meaningful basis of comparison of Acorn's treatment of Gaylord and nonblack employees. Vardounitis' file reflected a history of five disciplinary matters. The first was a report by Clarence Gipson, a black supervisor, of a meeting investigating an alleged fight between Vardounitis and another employee. Contrary to the ALJ's finding, the notation in Vardounitis' record does not establish that Vardounitis was disciplined for "provoking a fight with a coemployee." Rather, Gipson reported in that notation that the investigation revealed that Vardounitis and another employee had been engaging in "too much horseplay which resulted in angering [both men]," but that the matter had been settled quickly and amicably without the need for any formal "warning." There was also a "reminder notice" to Vardounitis signed by Clyde Jordan and Melvin Price, both black supervisors, that he had failed to report for work on a Saturday after promising his supervisor that he would work that

day. The document clearly stated that it was "not a warning notice but a reminder that a plant regulation has been broken." Vardounitis, like Gaylord, also received a warning letter and was docked 15 minutes' pay for leaving his work station for 10 minutes without permission. The record also revealed that Vardounitis had been discharged in 1973 when he failed to return from a leave of absence in Greece. Not noted by the ALJ was that the decision to discharge him was rescinded because he produced medical evidence verifying his illness. Similarly, the decision to discharge Gaylord for being absent without leave and failing to contact the company when he went to North Carolina was rescinded when he explained that he had been stranded without gasoline on the return trip. A letter written to Gaylord shortly after the incident indicates, however, that in contrast to Vardounitis, Gaylord had failed to notify his supervisors of his departure, secure permission to be absent from work or contact the company during his absence; thus, Gaylord's suspension was upheld. The final incident reflected in Vardounitis' history was a suspension for leaving the plant without obtaining permission or informing his supervisor. A three-day suspension was initially imposed, but it was reduced to a one-day suspension after Vardounitis explained that he had hurriedly left work after receiving a message from his supervisor that his wife had telephoned to inform him that his daughter had punctured her eardrum—which, it is uncontroverted, was also verified by medical evidence he submitted.

As we stated above, Vardounitis' record, though certainly not flawless, is not sufficiently similar either in the number or nature of disciplinary matters to provide the basis for a meaningful comparison of Acorn's treatment of Gaylord and nonblack coworkers. Of particular significance is that in sharp contrast to Gaylord's record, none of the five matters appearing in Vardounitis' record involved the express refusal to follow a direct order or any similar type of insubordination. In sum, the evidence does not support a finding that white employees with similarly serious disciplinary histories were not discharged simply because they were white.

We also find Gaylord's 22-year employment with Acorn to be material evidence which was accorded virtually no weight by the ALJ and the Commission in their findings of racial discrimination. Had Acorn's discharge of Gaylord been motivated by racial animus, it could have discharged him years earlier, "using" one of the numerous violations appearing in his record in the same pretextual manner he now posits Acorn "used" the incident of March 4, 1982. Finally, we note that Acorn also presented as evidence uncontradicted statistics it

had submitted to the Equal Opportunity Commission establishing, *inter alia*, that 43% of its employees and 29% of its supervisors are black—each of whom was promoted from the rank and file; but that only four, or 16%, of the 25 employees discharged during the two-year period prior to March 1982 were black. These statistics, while not determinative, are relevant as circumstantial evidence of Acorn's nondiscriminatory employment practices and should not have been discounted by the ALJ or the Commission.

On the basis of the record in its entirety, we hold that the order of the Commission adopting the ALJ's findings that Acorn's asserted reason for discharging Gaylord was pretextual and that Gaylord proved by a preponderance of the evidence that he was the victim of racial discrimination was contrary to the manifest weight of the evidence.

For the reasons stated, the order of the Human Rights Commission is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

JIGANTI, P.J., and LINN, J., concur.