ASHWIN SHAH, Petitioner-Complainant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

First District (5th Division)   No. 1—89—0069

Opinion filed December 15, 1989.—Rehearing denied January 17, 1990.

---

*Justice Pincham participated in the decision prior to his resignation.

Ashwin Shah, of Chicago, petitioner *pro se.*

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Tanya Solov, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Kenneth A. Jenero, of Borovsky, Ehrlich & Kronenberg, of Chicago, for respondent Warshawsky & Company.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Petitioner Ashwin (Kenny) Shah appeals from an order of the Illinois Human Rights Commission (Commission) entered in a case arising out of his charges of employment discrimination against respondent Warshawsky & Company. Warshawsky discharged Shah from his job as a stock supervisor on May 7, 1984. Shah, who is an Asian Indian native, filed a charge of employment discrimination with the Department of Human Rights (Department) alleging that he had been subjected to discriminatory working conditions and harassment because of his national origin. An amended charge claimed that Shah was unlawfully discharged because of his national origin, an alleged physical handicap, and/or in retaliation for opposing the alleged discriminatory practices of Warshawsky.

The Department conducted an investigation of Shah's charges and, after a fact-finding conference, issued a report in March 1985. The Department found that there was substantial evidence to support Shah's claims that he was subjected to unequal terms and conditions of employment, *e.g.*, required to perform union duties and being frequently paged on his breaks—tasks not required of non-Indian supervisors. The Department dismissed Shah's unlawful discharge claims after concluding that there was insufficient evidence to support them. It was instead determined that Shah was discharged for falsifying his employment application in several aspects: his educational level; dates of prior employment, duties, and reasons for leaving; and concealment of a preexisting ankle injury.

The report also indicated that Bashir Khan, an Indian manager for Warshawsky, had recommended Shah's discharge and that non-Indian employees had been discharged for falsifying employment applications. The Department further found that Shah's retaliatory discharge claim was baseless since Warshawsky did not have notice of the alleged discrimination prior to his discharge. It additionally concluded that Shah's ankle injury did not qualify as a protected handi-

cap under the Illinois Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 1—103(I)).

Thereafter, Shah requested review by the Commission of the Department's dismissal of his discharge claims. In response, the Department reiterated all but one of its original findings and conclusions. After receiving an affidavit by Jay Thakker, another Indian supervisor, the Department decided there was substantial evidence to support Shah's claim that he was discharged because of his national origin. After reviewing the two charges dismissed by the Department, the Commission found that more evidence was needed in order to determine whether Shah's ankle injury was a protected handicap. However, the Commission agreed the handicap claim should be dismissed because there was no substantial evidence indicating that Shah had been dismissed for this reason. The same finding was made with respect to the retaliatory discharge claim, and both claims were dismissed in October 1985. A complaint of civil rights violation was then issued on two bases: the unequal terms and conditions of employment claim and the claim of discharge based on national origin. Shah then moved to amend the complaint to include the claim of handicap discrimination, and the Commission denied the motion.

A public hearing lasting five days was held on the complaint in January 1987. The administrative law judge (ALJ) issued her 37-page recommended order and decision in January 1988. After reviewing the evidence, the ALJ prepared detailed findings including the following.

Shah was hired by Warshawsky as a stock supervisor in July 1983 after being interviewed by the personnel manager, Thomas Bykowski; William Stankiewicz, stock manager; Bashir Kahn, warehouse manager; and William Bondy, operations manager. Bondy and Kahn were unfavorably impressed with Shah and told Stankiewicz to interview other applicants. Stankiewicz kept insisting that Shah was well qualified for the position and eventually prevailed. Shah was offered the position at a salary of $350 per week. Shah then filled out an employment application form. He responded negatively to the questions: "Were you ever injured?" and "Do you have any physical defects that preclude you from performing any work for which you are being considered?" In fact, in January 1980, Shah had fallen on ice and shattered the bones in portions of his right foot and leg and had had screws and a plate surgically inserted in his ankle with subsequent therapy. By signing the application, Shah certified that his statements were true. Warshawsky does not routinely verify information given on a supervisor's employment application and did not do

so with Shah's application. Under Warshawsky's personnel policy, applicable to all employees, falsification of an employment application is grounds for suspension or termination, and, prior to Shah's dismissal, several union employees had been terminated for this reason.

On July 18, 1983, Shah started working for Warshawsky as a supervisor of the sixth floor and supervised six to eight union employees. Stankiewicz, who is of Polish national origin and was Shah's supervisor, reported to Khan who, like Shah, is originally from India. Khan reported to Bondy, a white American male. Other stock supervisors included Jay Thakker, of Indian origin; and other males of Polish, Puerto Rican, and black American origins. All supervisors had the same duties, *e.g.*, assigning work to stock clerks, directing the timely movement of stock, maintaining good housekeeping and keeping aisles free of blockage, maintaining proper levels of stock for the filling of orders, and resolving stock irregularities and incomplete orders.

In the fall of 1983, Khan discovered that Shah had failed to timely process several stock transfers and that he had backdated certain transfer documents. Khan warned Shah that he would lose his job if he was again involved in falsifying documents. In October 1983, Stankiewicz reported to Khan that he was experiencing problems with Shah's work performance. Stankiewicz prepared a written "special review," noting that disciplinary action would be taken if Shah continued to circumvent Warshawsky's established procedures. As stock manager, Stankiewicz similarly counselled, warned, and disciplined non-Indian stock supervisors.

After the special review, Shah's performance improved substantially and he was complimented by Stankiewicz, Khan, and Bondy. As a result, Stankiewicz then transferred Shah to the fourth floor, one of the busiest floors with more stock and clerks. For the most part, Stankiewicz was pleased with Shah's fourth-floor performance and gave him handwritten congratulatory memos to that effect and, in addition, generally supported Shah's handling of personnel problems. In December 1983, Shah met with Khan to complain of alleged inadequacies in Stankiewicz' supervision of him. Khan told Shah that he would seek a transfer for him. Later in December, Shah requested four days off during the holidays. After first refusing because of Shah's lack of seniority, Stankiewicz changed his mind after conferring with Khan and gave Shah one day off. Shah responded that he would take the remaining three days as sick leave, and Stankiewicz requested a physician's statement. Thereafter, Shah threatened to sue the company and, after a meeting with Stankiewicz and Khan,

was warned to stop threatening Warshawsky.

On January 23, 1984, Stankiewicz prepared a six-month review of Shah's performance—rating him satisfactory overall, excellent as to employee development, and good for all other factors—and recommended an 8½% salary increase. The only other employee for whom Stankiewicz recommended a large increase was Jay Thakker, who was the highest paid stock supervisor. Both Khan and Bondy questioned such a large increase for a six-month employee, but Stankiewicz prevailed, arguing that Shah's performance had improved 100% after the special review. Shah initially refused the increase, saying that it was not enough. After meeting with Kahn and Stankiewicz, Shah accepted the raise but noted on the payroll documents, "Too Low Increase!"

Beginning in February 1984, Stankiewicz discovered that many irregularity reports regarding fourth-floor stock were being voided, which meant that stock initially reported missing was later found on the floor. On one such occasion, Stankiewicz checked for the missing stock and, by following established procedures, located it behind another box. Shah was warned about insufficient searches and told to work on the floor rather than remaining at his desk. Shah became upset, and after shouting at Stankiewicz for a while, was told that he was fired. Shah and Stankiewicz then met with Khan in the latter's office. Khan said he would investigate the matter and warned Shah about being insubordinate. In addition to questioning both participants during the investigation, Kahn talked to a stock clerk who witnessed the event and who was of Indian origin. The clerk corroborated Stankiewicz' version, and Khan reported his findings to Bondy. After a meeting with Bondy, Khan, and Shah, Khan decided to place Shah on six-months' probation, and written notice was given to him. Following this, Shah wrote a letter to the company's president stating that all the stock supervisors considered Stankiewicz to be incompetent. Although space was alloted for the signatures of both Shah and Thakker, only Shah signed it. There is no evidence that Warshawsky ever received the letter prior to Shah's termination.

Warshawsky has a policy prohibiting supervisory employees from performing bargaining-unit (union) work. However, when necessary, supervisors occasionally perform certain housekeeping chores, such as keeping the aisles clear, moving hand trucks, etc., in order to avoid safety hazards. When Stankiewicz instructed supervisors to, *e.g.*, "clean your floor," he expected them to have their clerks perform the task. No union grievance had ever been filed against the company because supervisors had performed union work.

The record also indicates that Stankiewicz needed to frequently page supervisors on a public address system. All supervisors had been paged while on lunch or coffee breaks, and all of them had complained about this practice. Supervisors were also expected to use the stairs instead of elevators—generally, one flight up and two flights down—so as to reserve elevators for stock. All supervisors had several times complained to Khan regarding Stankiewicz' treatment of them, *e.g.*, he was too tough or too demanding. During busy periods, Stankiewicz would transfer clerks from one floor to a busier floor. Shah and two non-Indian supervisors had complained that this practice left them unfairly short-handed on their floors. At some time after receiving a copy of a political cartoon with handwritten comments derogating Asian Indians, Thakker took it to Stankiewicz. An investigation revealed it was sent from a department not under the control of Stankiewicz, Khan, or Bondy. Khan telephoned the appropriate manager and requested him to discipline the responsible party.

The ALJ also found that Shah's duties required that he spend 90% to 95% of his time patrolling the warehouse floor on foot. In late January 1984, Khan noticed that Shah was spending an inordinate amount of time seated at his desk, sometimes with his foot propped up on the desk. Upon Khan's inquiry, Shah said that his ankle bothered him when he walked. During February and March, Shah was observed seated more frequently (the early months of the year were Warshawsky's peak season) and his absences from work increased. Stankiewicz discussed these matters with Shah.

In February, Khan requested a copy of Shah's employment application and afterwards informed Bondy that the application did not mention any ankle injury. Bondy noted that Shah had also stated on the form that he had no physical problem that would prevent him from doing his job. Since Shah's ankle was interfering with his job performance, Bondy asked Dale Bradley, the personnel director, to check other information on the application. In checking Shah's representation that he had earned a master's degree from Roosevelt University, Bradley was told by a woman in the university's records department, in a telephone conversation, that Shah had only attended the school for one semester and had not earned a degree. Bradley asked for a written confirmation several times, but it was not received before Shah's dismissal.

Subsequently, in early March, Bradley sent verification requests to four of Shah's listed previous employers and learned that (1) Shah had worked for Sweetheart Cup for three months and was discharged for unsatisfactory performance—Shah had claimed that he

worked there 22 months and was laid off; (2) Olson Electronics responded that Shah had worked for it for seven months as a full-time salesman—Shah's application claimed that he had worked there for 20 months as a manager. One of the other companies listed had gone out of business, and the records of the fourth company were unavailable since it was in the process of moving.

On April 2, a pin in Shah's ankle popped out and he gave Stankiewicz a doctor's statement indicating that surgery was required. Shah requested four to six weeks' medical leave. When Khan, who was upset at being left short-handed during the company's busy season, confronted Shah about his failure to list the ankle injury on his application, Shah accused management of having altered the form. He later said that he had possibly overlooked the inquiry questions. Khan asked permission of Bondy to terminate Shah. Bondy advised Khan to give Shah medical leave since the application investigation was still being conducted. It was Warshawsky's policy to not terminate an employee who was on, or was going on, medical leave.

Surgery was performed on Shah on April 6, and he returned to work on May 7. Bondy gave Khan permission to discharge him on his return. The reasons given for the discharge were: (1) falsification of Shah's application for not revealing his ankle injury; and (2) misstatements regarding his education. Bondy did not use the prior employment history discrepancies because he had been told that Shah had filed several lawsuits and Bondy feared he might file one against Sweetheart Cup. Stankiewicz was not consulted nor did he participate in the discharge decision.

When Shah was informed of his discharge and the reasons therefore, he objected and insisted that he had a master's degree. Bondy dropped the education misrepresentation basis since he had not yet received written confirmation from Roosevelt University. Bondy then told Khan to discharge Shah just for "falsification of information." On his day of discharge, Shah filed a discrimination charge with the Department of Human Rights.

Basing her decision upon these facts, the ALJ concluded that the preponderance of the evidence did not support Shah's claim of national origin discrimination. Furthermore, Warshawsky's reason for Shah's discharge, *i.e.*, a good-faith belief that he had falsified his employment application, was legitimate and nondiscriminatory, and Shah failed to demonstrate that it was a pretextual reason.

A panel of three Commission members approved and adopted the ALJ's recommendations. Shah's request to present additional evidence was denied, and the panel also ruled that, based on the evi-

dence, the ALJ was correct in not considering the handicap discrimination claim. The full Commission denied Shah's petition for rehearing, and this direct appeal followed.

In his appeal, Shah contends, in part, that the Commission's decision should be vacated, reversed, modified with or without remand; that the order is against the manifest weight of the evidence and/or is arbitrary and constitutes an abuse of discretion; certain evidentiary rulings were incorrect; and that Shah was denied due process of law. Warshawsky argues that (1) the Commission's determination that Shah was not discriminated against on the basis of his national origin was not against the manifest weight of the evidence; (2) this court lacks jurisdiction to review the administrative dismissal of Shah's handicap discrimination and retaliation claims; (3) if jurisdiction does exist, dismissal was appropriate under the applicable standard of review; and (4) Shah's other efforts to reinstate the handicap and retaliation claims, e.g., remand for the taking of additional evidence or amendment of complaint, are without adequate bases. In its brief, the Commission adopted Warshawsky's arguments with three exceptions pertaining to whether Shah had initially established a prima facie case of discrimination; whether certain allegedly illegal questions, e.g., those inquiring about an applicant's prior injuries, can be a legitimate basis for an employee's discharge; and the jurisdictional issue.

The reason we have set forth the facts of this case in such detail is to demonstrate the all too frequent misuse of our judicial system today. Had this appeal been filed by any person other than a pro se petitioner, it would probably have been dismissed as a frivolous appeal. Given the applicable standard of review, these facts clearly illustrate that the Commission's decision was unquestionably correct and must be affirmed.

Warshawsky's jurisdictional objection that an order entered by the Commission on October 10, 1985, dismissing Shah's claims of physical-handicap discrimination and retaliatory discharge was final and, thus, required a petition for review within 35 days thereof is without legal foundation. First, we must mention that at the time of the 1985 order, section 8—111(A)(1) of the Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 8—111(A)(1) (since amended)) provided for judicial review of the Commission's orders in accordance with provisions of the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 et seq.). In 1985, a proceeding for review was commenced by the filing of a complaint in the circuit court and issuance of summons within 35 days after service of a copy of the final

agency decision. Ill. Rev. Stat. 1985, ch. 110, par. 3—103.

■■ ■ Although the Human Rights Act does not define "final order," section 3—101 of the Administrative Review Law defines an "administrative decision" as "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and *which terminates the proceedings before the administrative agency."* (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 110, par. 3—101.) With certain exceptions, not applicable here, review of an administrative agency decision is not available until all administrative relief has been exhausted. (*City of Springfield v. Carter* (1989), 184 Ill. App. 3d 1.) Proceedings on Shah's complaint had not been terminated in October 1985 with the dismissal of two of his charges; his discrimination based on national origin claim was still pending before the Commission. Thus, there was no finality at that time, and this court, therefore, has jurisdiction to review the Commission's rulings on the handicap discrimination and retaliation claims as well as the national origin claim.

■■ Contrary to Shah's assertions, the role of an appellate court in reviewing Commission orders is quite limited. It must sustain the Commission's fact findings unless they are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2).) An agency's factual determinations are contrary to the manifest weight of the evidence only when they are palpably erroneous or when the opposite conclusion is clearly evidenced. (*Smith v. Chicago Board of Education* (1988), 176 Ill. App. 3d 109.) This court cannot reweigh evidence, determine witnesses' credibility, or independently evaluate the facts. (*Pioneer Life Insurance Co. v. Woodard* (1987), 152 Ill. App. 3d 236.) Since the record does not evince that the ALJ's findings of fact, as adopted by the Commission, were contrary to the manifest weight of the evidence, this court is limited to determining whether the Commission's final decision is either legally erroneous or factually against the manifest weight of the evidence. *Pepsi-Cola General Bottlers, Inc. v. Human Rights Comm'n* (1985), 137 Ill. App. 3d 288.

■■ In making that determination, we use the three-step analysis enunciated in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, to review employment discrimination cases. First, petitioner must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. Upon such a showing, an employer then has the burden of proof to rebut the presumption of unlawful discrimination by articulating a clear,

nondiscriminatory reason for its employment decision. If the employer meets this burden, the presumption fails and the petitioner must then prove by a preponderance of the evidence that the employer's reason is not the true reason, but merely a pretext. (See also *Milan v. Human Rights Comm'n* (1988), 169 Ill. App. 3d 979.) Thus, the ultimate burden of proving that an employer engaged in intentional discrimination rests on the complainant (*Acorn Corrugated Box Co. v. Human Rights Comm'n* (1989), 181 Ill. App. 3d 122), and Shah has failed to meet this standard of proof.

■ Shah, as an Asian Indian, is clearly a member of a group protected from discrimination on the basis on national origin. (Ill. Rev. Stat. 1985, ch. 68, pars. 1—103(K), (Q).) His complaint alleges facts which, if true, establish a basis for a discrimination charge. However, his *prima facie* case indicating that he was subjected to unequal terms and conditions of employment because of his national origin was successfully rebutted by Warshawsky showing that it had treated Shah no differently than its other employees. The evidence fully supports Warshawsky's claim that all supervisors—Indian and non-Indian—were treated in a similar manner, *e.g.*, they were expected to keep their aisles clear of safety hazards and to use stairs instead of elevators when necessary, were paged during their lunch hours and breaks, and sometimes had staff removed from their floors. In fact, one could easily deduce an opposite conclusion in that Stankiewicz insisted on hiring Shah, quickly promoted him, complimented and supported him, and gave him a salary increase larger than all other supervisors, except for Thakker, who is also of Indian origin. And, when the derogatory cartoon incident occurred, Shah's superiors immediately investigated and informed the appropriate manager (not in Shah's division) to take corrective action.

■ Warshawsky also demonstrated a legitimate, nondiscriminatory reason for discharging Shah—falsification of his employment application—a reason underlying the discharge of other, non-Indian employees. The record indicates that when Shah could not properly perform his duties because of his ankle problems, Warshawsky decided to look at his application form. After so doing, and following an investigation, Shah's employer concluded that Shah had deliberately falsified his answers, not only as to his prior ankle injury but also as to his employment history and his level of education. Although it was discovered after Shah's discharge that he did indeed have a master's degree from Roosevelt University, at the time of Shah's termination, Warshawsky had good reason to believe the information given to it by the university. A good-faith belief for an em-

ployment decision is sufficient to rebut an intentional discrimination charge. (See *Turner v. Texas Instruments, Inc.* (5th Cir. 1977), 555 F.2d 1251; *Patton v. Carson, Pirie, Scott & Co.* (1982), 7 Ill. HRC Rep. 116.) Shah's employer also considered the factors concerning his honesty and integrity in making its discharge decision, *e.g.*, backdating of documents. Shah failed to proffer any evidence that would indicate that these reasons given by Warshawsky for his discharge were pretextual and that he was actually terminated because he is an Asian Indian.

■ It is also clear that the Commission was correct in denying Shah the right to reinstate his handicap discrimination charge after the ALJ dismissed it. Shah did not demonstrate the existence of any substantial, relevant evidence on this matter which was unavailable at the time of the hearing and which could not have been discovered with due diligence as required by Commission rules. (See 56 Ill. Adm. Code, §5300.1010 (1985).) We also agree that the prerequisites for establishing a *prima facie* case of handicap discrimination are nonexistent in this case, since Shah's alleged handicap is clearly related to the adequate performance of his job as a stock supervisor. (See Ill. Rev. Stat. 1985, ch. 68, par. 1—103(I)(1); *Acorn Corrugated Box Co. v. Human Rights Comm'n* (1989), 181 Ill. App. 3d 122.) Moreover, the evidence shows that Shah was discharged for falsifying his employment application, not only as to injury inquiries, but also regarding his employment history and educational level.

Accordingly, we must affirm the Commission's order since the record overwhelmingly supports its conclusions.

Affirmed.

PINCHAM* and COCCIA, JJ., concur.

---

*Justice Pincham participated in the decision prior to his resignation.