RUSS BERRIE AND COMPANY, INC., Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Appellees.

Second District   No. 2—91—0258

Opinion filed January 30, 1992.—Rehearing denied March 11, 1992.

WOODWARD, J., dissenting.

Mark A. Casciari, Patricia J. Hruby, and Richard M. Lyon, all of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield, and Kent Sezer, of Human Rights Commission, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Potter & Schaffner, of Chicago (Mark S. Schaffner, of counsel), for respondent Louis Carr, Jr.

JUSTICE INGLIS delivered the opinion of the court:

Petitioner, Russ Berrie and Company, Inc. (Berrie), appeals from an order of respondent, the Illinois Human Rights Commission (Commission), entered on October 2, 1990. The appeal is pursuant to section 8—111 of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(A)(1)). The Commission affirmed the decision of the administrative law judge (ALJ) finding that Berrie racially discriminated against respondent, Louis Carr, Jr. (Carr), in denying him employment. The petitioner raises three issues on appeal: (1) whether the Commission's finding was contrary to law and against the manifest weight of the evidence; (2) whether the Commission erroneously failed to consider evidence related to Carr's credibility and qualifications; and (3) whether the remedy of "instatement" by the Commission was an abuse of discretion. We reverse.

In July 1983, Carr, a black male, responded to a newspaper advertisement placed by Berrie. The advertisement offered a career opportunity in the sales field. Berrie sells a variety of gift items to retail stores, which in turn sell them to consumers. The Berrie distribution center in question is located in Itasca, Illinois. Carr sent in a cover letter and resume in response to the advertisement.

Each person who responded to the advertisement was interviewed at a hotel in Schaumburg, Illinois. Over 100 applicants were interviewed by various company representatives. Carr was interviewed by Sandy Presser, a regional sales manager for Berrie. Carr discussed his education and work experience, hobbies and the like. Ms. Presser told Carr he was the type of person Berrie was looking for. After all the interviews were completed, Sarah Sekulski, the director of sales,

was given the resumes of applicants invited for second interviews. Carr was one of the invited applicants.

About two weeks later, Carr was called in for a second interview at the Itasca office. Ms. Sekulski was the interviewer. The Commission found that Sekulski asked Carr whether he felt inferior to white people and whether he would be comfortable selling to them. Sekulski denies asking those questions at the interview. After a second interview, the next step in the hiring process was a day in the field. Sekulski did not recommend Carr for a day in the field because she did not find him credible. He stated on his resume that he had a 90% closing ratio as an insurance salesman. Sekulski also thought that he lacked the proper attitude for the position. Sekulski did not inform Carr of this decision. He eventually contacted another Berrie official who told him the position had been filled.

In approximately December 1983, Carr saw another newspaper advertisement by Berrie seeking sales help. He responded again by sending a cover letter and resume. Again, he received an invitation initially to interview at a hotel, which was attended by approximately 150 to 175 applicants. Carr was scheduled to interview with a clerical employee, but when he mentioned that he had previously interviewed with Berrie, he was sent to Ms. Sekulski. Sekulski referred him to Randy Gendreau, a regional sales manager, for an independent opinion on Carr's qualifications. Gendreau conducted the interview and noticed the 90% closing ratio figure on Carr's resume. Gendreau found Carr unfit to continue the interviewing process.

Carr filed a complaint on October 25, 1985, alleging racial discrimination on the part of Berrie. Hearings were conducted in July and August 1986. On July 1, 1987, the ALJ recommended that Carr be instated in the position of sales representative with Berrie because of discrimination on the part of Sarah Sekulski. Randy Gendreau was found to have acted in a nondiscriminatory manner. Berrie was to pay lost wages of $21,379.28, and pay Carr's attorney fees and costs, which amounted to $25,115.61. Berrie was also to cease and desist from racial discrimination in its hiring practices. On October 2, 1990, the Commission entered an order affirming the recommendations of the ALJ.

Berrie's petition for rehearing, pursuant to section 8A–103(F) of the Act (Ill. Rev. Stat. 1989, ch. 68, par. 8A–103(F)), was denied on February 1, 1991. Petitioner filed a timely appeal on March 5, 1991.

Petitioner first contends that the Commission's finding of racial discrimination was contrary to law and against the manifest weight of the evidence. The Commission's findings of fact will be sustained un-

less the findings are against the manifest weight of the evidence. (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(A)(2); *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180.) A judgment is against the manifest weight of the evidence when an opposite conclusion is clearly evident from the record. (*Evert v. Board of Trustees of the Fire Fighters' Pension Fund* (1989), 180 Ill. App. 3d 656, 660.) The weight given to testimony and the credibility of the witnesses is within the function of the agency. *Jackson v. Board of Review of the Department of Labor* (1985), 105 Ill. 2d 501, 513.

■ Our supreme court adopted a three-step process used by the United States Supreme Court to analyze employment discrimination actions. (*Zaderaka*, 131 Ill. 2d at 178, citing *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) First, the complainant must establish a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, there is a rebuttable presumption that the employer unlawfully discriminated against complainant. The burden of production then shifts to the employer to show a nondiscriminatory reason for the decision. If the employer carries the burden and rebuts the presumption, the complainant must prove by a preponderance of the evidence that the employer's articulated reason was a pretext for unlawful discrimination. (*Zaderaka*, 131 Ill. 2d at 178-79.) Throughout these stages, the burden of persuasion remains on the complainant. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256, 67 L. Ed. 2d 207, 217, 101 S. Ct. 1089, 1095.

■ Petitioner did not dispute the finding that Carr met the burden of proving a *prima facie* case, creating the rebuttable presumption that Berrie unlawfully discriminated against Carr. Respondents cite the ALJ's finding that Carr need only meet the minimum objective qualifications for the position to prove a *prima facie* case of discrimination. (See *Burrus v. United Telephone Co. of Kansas, Inc.* (10th Cir. 1982), 683 F.2d 339, 342.) According to the Commission, the only objective qualifications for a sales position at Berrie were that a resume be submitted and that the applicant have reliable transportation.

The presumption of unlawful discrimination was found to be rebutted by the Commission. Sekulski's reasons for not recommending Carr were that he made a misrepresentation on his resume and that he did not possess an attitude that Berrie deemed appropriate for sales. The Commission's conclusion that these reasons were nondiscriminatory is not contested by respondents.

The burden then shifted to Carr to prove that Berrie's reasons for not hiring him, the 90% closing ratio and his attitude, were a pretext for unlawful discrimination. Carr alleges that Sekulski asked him whether he felt inferior to white people or would have difficulty selling to them. The Commission made a finding of fact that Sekulski asked this question. Carr further argues that a memorandum Sekulski wrote concerning the interview with Carr demonstrates that Sekulski did not rely on the 90% closing figure when denying him employment. Finally, Carr argues that discrimination was evident based on the number of black people hired by Berrie at the two interviews attended by Carr, as well as the percentage of black people employed by Berrie at the time. For the reasons expressed below, we hold that the Commission's finding that the 90% closing ratio was a pretext to unlawful discrimination was against the manifest weight of the evidence.

■ The Commission's conclusion that Sekulski asked Carr whether he felt inferior to white people or would have difficulty selling to them is not supported by the record. The ALJ found that Carr should be believed over Sekulski because a previous applicant testified that Sekulski had asked her whether she would be comfortable selling to people of different nationalities. In fact, the record on appeal does not reflect this testimony. The Commission specifically found that this question was not asked by Sekulski in a previous interview. But, the Commission found that this factual error was "minor" and upheld the ALJ's finding that Sekulski had asked Carr the improper racial questions. The error made by the ALJ was not minor. Without the corroborating testimony supporting Carr's assertion of improper questioning, there is little evidence to support the Commission's finding that Sekulski asked Carr whether he felt inferior to white people or would have difficulty selling to white people.

■ The memorandum Sekulski wrote in January 1984 concerning Carr's interview does not suggest that the 90% closing figure on Carr's resume was a pretextual reason for denying him employment. In that memorandum, Sekulski failed to mention the 90% closing ratio or any other reason for denying Carr employment. Sekulski's memorandum was an outline of her interview with Carr that did not include a list of reasons for denying him employment. The purpose of Sekulski's memorandum was to clarify what questions she had asked at the interview and to determine whether any improper questions were asked by Sekulski. It would be unfair to determine whether Sekulski denied Carr employment because of his race based on information missing from a memorandum which was not meant to be the subject of the requested memorandum.

■ Finally, the Commission and ALJ rely on the general hiring practices of Berrie to establish racial discrimination in this case. The small number of black people hired at the Berrie center in Itasca may lead to an inference of discrimination. But, the general hiring practices alone are not conclusive evidence of racial discrimination. The Commission recognizes this when quoting *Miles v. M.N.C. Corp.* (11th Cir. 1985), 750 F.2d 867, 873:

> "[It was] never claimed that the statistical evidence proved [the] case of disparate treatment, but only that it showed a pattern of favoring whites over blacks ***. *** [S]tatistical evidence *** provided a background against which to assess [the] claim."

■ In contrast to the Commission's finding, there is ample evidence in the record to support the contention that Carr was denied employment for a legitimate, nondiscriminatory reason. The Commission found that Carr had "something on his resume," namely a 90% closing ratio figure, "which was impossible by generally-accepted insurance company definitions." The ALJ found that "[c]omplainant testified that in his view a closing ratio refers to the final act; that is, a sales presentation." The ALJ also stated that she did believe that Carr was being dishonest in using that figure. We find that the evidence shows the 90% closing ratio figure was equivalent to a misrepresentation.

An insurance expert testified that "closing ratio" was the number of persons asked to purchase insurance versus the number of persons who purchase insurance. The expert also testified that a 90% closing ratio was "preposterous." Even Sekulski and Gendreau were familiar with the accepted definition of a closing ratio, though they had not been employed in the insurance industry. Carr had been employed in the insurance industry for approximately five years, prior to applying with Berrie. It is unreasonable to believe that Carr was not familiar with the proper definition of closing ratio. Thus, the inclusion of a 90% closing ratio on Carr's resume was equivalent to an intentional misrepresentation.

Another fact of great significance to this court is that Carr was interviewed a second time. Sekulski had Gendreau reinterview Carr when he reapplied in December 1983. Instead of summarily rejecting Carr, Sekulski sought an independent opinion on Carr's qualifications. The ALJ determined that Gendreau denied Carr employment for a legitimate reason—the 90% closing ratio figure on Carr's resume. Gendreau did indeed provide a more detailed summary of his interview with Carr than the one provided by Sekulski. But, this factor alone

should not be conclusive. Gendreau's legitimate rejection of employment is significant in deciding whether Sekulski rejected Carr for a nondiscriminatory reason.

We hold that the Commission's finding that Berrie's reason for not hiring Carr was a pretext for unlawful discrimination was against the manifest weight of the evidence. Carr failed to prove that the misrepresentation on his resume was a pretextual reason for not hiring him. As such, we need not discuss whether his alleged "cocky" attitude was a valid justification. Our determination is not based on reweighing evidence or making an independent finding of fact. If an administrative agency's finding lacks evidentiary support in the record, it must be set aside as against the manifest weight of the evidence. *Pioneer Life Insurance Co. v. Woodard* (1987), 152 Ill. App. 3d 236, 244-45.

The percentage of minorities hired and employed by Berrie at that time appears to be unrepresentative. However, a successful complainant must present more evidence than this. In the end, Carr's misrepresentation, coupled with the lack of evidence of Berrie's discriminatory motive, prevented Carr from being a successful complainant.

The remaining issues presented by the petitioner are moot.

The order of the Commission entered on October 2, 1990, is reversed.

Reversed.

McLAREN, J., concurs.

JUSTICE WOODWARD, dissenting:

I respectfully dissent. The issue before us is whether the Commission's decision was against the manifest weight of the evidence. As stated by the majority, "[a] judgment is against the manifest weight of the evidence when an opposite conclusion is clearly evident from the record." (224 Ill. App. 3d at 878; *Evert v. Board of Trustees of the Fire Fighters' Pension Fund* (1989), 180 Ill. App. 3d 656, 660.) This determination should not be based on reweighing evidence or making an independent finding of fact.

Carr's complaint alleging racial discrimination was based on the following facts: (1) that Sekulski asked him whether he felt inferior to white people and whether he would be comfortable selling to them; (2) Sekulski's memorandum regarding her interview with Carr demonstrated that the 90% closing ratio was not relied on as a basis for de-

nying employment; and (3) that Berrie's discrimination was demonstrated by the absence of black people employed by it.

The majority found that the Commission's conclusion that Sekulski asked Carr whether he felt inferior to white people or would have difficulty selling to them was not supported by the record. I specifically disagree with the conclusion of the majority. In addressing this issue, the Commission stated the following:

"[T]he respondent argues that it was error for the Administrative Law Judge to find that Sekulski asked Carr about his ability to sell to white customers and his feelings of inferiority. The complainant presented clear, direct testimony that these statements had been made. Obviously, it was in complainant's interest to testify to these statements. It is equally obvious that it was in the respondent's interest that Ms. Sekulski deny making these statements. A clearer conflict in witness credibility could not be imagined. Obviously, one of the witnesses was not telling the truth. It is precisely the job of the fact-finder to determine where the truth lies when evidence is in conflict. The fact that the Administrative Law Judge found against the respondent does not make her finding against the manifest weight of the evidence."

It is evident that the Commission determined this issue based upon its overall assessment of Sekulski's credibility. Clearly the evidence demonstrated Sekulski's lack of credibility in several key areas. Sekulski testified that her decision not to hire Carr was based on her belief that he had lied on his resume about his closing ratio in a previous job.

But her testimony before the ALJ set forth below reveals that she did not pursue this concern with Carr.

"Q. You emphasized what the closing ratio means in your business. You aren't aware of the meaning of closing ratio in other fields or other businesses, are you?

A. Not to any great extent.

Q. You don't have personal knowledge as to that?

A. No.

Q. And in fact, at the interview with Mr. Carr, you didn't ask him about the meaning of the closing ratio; did you?

A. No, I did not.

Q. In fact, you didn't ask him anything about what the 90 percent close ratio was?

A. I can't recall whether I asked him about the 90 percent close ratio."

Furthermore, Sekulski made no reference to said closing ratio in her January 1984 memorandum which described her interview with Carr, even though this memorandum was prepared in response to Carr's lawsuit. Her failure to discuss the primary reason for denying Carr employment casts considerable doubt on Sekulski's veracity.

Adding to Sekulski's credibility problems is her testimony that she recommended denial of employment based, in part, on Carr's lack of enthusiasm and his cocky attitude. Yet her January 1984 memorandum makes no reference to either Carr's lack of enthusiasm or his cocky attitude.

The overriding issue before us is Sekulski's credibility. Given the above-cited discrepancies between her memorandum and her testimony, the Commission was certainly entitled to find Sekulski's testimony lacking in credibility. Accordingly, the Commission's determination that Sekulski did indeed ask Carr if he felt inferior to whites and whether he could sell to them was supported by the record.

Furthermore, contrary to the majority's assertion, the Commission was entitled to diminish the significance of the ALJ's erroneous reliance on another witness' testimony. The fact that a white female applicant denied being asked by Sekulski whether she could sell to people of different nationalities has little bearing on the case before us. What matters is whether Sekulski asked the question of Carr, not whether she asked a white applicant a racially based question. The Commission could certainly conclude that such testimony was of little relevance to the issue under consideration.

The opinion of the majority implies that for Carr to be believed he must present some corroborating evidence. That simply is not the standard. In cases such as this, when a racially motivated remark is made, a third person is usually not present. In most situations, it will be one person's word against another. Here, Carr said Sekulski asked the disputed question; Sekulski denied that she had. It was the Commission's task to decide who was telling the truth. It agreed with Carr, and that decision is supported by the evidence as above discussed.

Bolstering the Commission's finding in Carr's favor was the statistical evidence presented regarding respondent's hiring practices during the relevant period. The record demonstrates that from 10% to 15% of the applicants in the subject 1983 hiring seminar were black. No black applicants were among the 29 new sales representatives hired by respondent after this seminar. Employment statistics of respondent as a whole and, in particular, the Itasca Distribution Center are examined. These statistics, as revealed on respondent's EEO-1

reports to the EEOC, show a substantial underrepresentation of blacks in its sales force. In March 1984, the closest period in time to the alleged discriminatory act for which statistics were available, respondent failed to employ even a single black out of the 421 salespeople it employed nationally. In 1985 respondent employed one black salesperson out of its 566-person sales force. The evidence further showed that not a single black person was employed from March 1982 through July 1984 in respondent's Itasca office, despite the fact that approximately 45 blacks applied for jobs during that period of time.

Admittedly, such statistical evidence in and of itself is not sufficient to support a racial discrimination charge. However, when viewed in conjunction with evidence of specific discrimination against a particular job applicant, such statistical evidence serves to confirm the charge of discrimination.

Finally, the majority finds it significant that Carr was interviewed again by respondent in December 1983. As the issue before us is respondent's actions during the July 1983 interview, a second interview held months later has no bearing on whether respondent discriminated against Carr in July 1983. Moreover, Sekulski did not contact Carr for an interview in December 1983. Carr happened to see respondent's advertisement in a newspaper's help wanted section and made his application. Permitting Carr a second interview was nothing more than a perfunctory act on respondent's part. Also, respondent did not hire Carr after his second interview, a further indication of respondent's unwillingness to hire black applicants who meet hiring requirements.

It is the Commission's province to determine the witnesses' credibility, and such findings are entitled to deference by courts of review. (*Quincy School District No. 172 v. Human Rights Comm'n* (1990), 197 Ill. App. 3d 694.) Such findings will be deemed contrary to the manifest weight of the evidence only if they are palpably erroneous or if an opposite conclusion is clearly evidenced. (*Shah v. Human Rights Comm'n* (1989), 192 Ill. App. 3d 263.) Under this standard, the Commission's decision should stand.