ANNIE JOHNSON, Petitioner, v. THE HUMAN RIGHTS COMMISSION et al., Respondents.

First District (1st Division)  No. 1—99—3705

Opinion filed December 26, 2000.

Charmain E. Dwyer, of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Diane M. Potts, Assistant Attorney General, of counsel), for respondents.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Annie Johnson sued Chicago-Read Mental Health Center (Read) for racial discrimination and retaliatory discharge. The Human Rights

Commission (Commission) found that Johnson proved one claim for racial discrimination, but she failed to prove that Read discharged her either on the basis of racial discrimination or in retaliation for filing the complaint. Johnson appeals directly to this court pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)).

Read hired Johnson in 1989. She received two promotions, so that in 1994 she worked as a "Mental Health Technician II." In the last performance evaluation she received before her discharge, her supervisor found that Johnson met or exceeded expectations in all categories for evaluation. The supervisor particularly noted that Johnson exceeded expectations for human relations, in that she helped maintain a cordial work climate that promoted harmony.

On August 18, 1994, a patient struck Johnson repeatedly when staff members denied the patient's request for a cigarette. The nurse in charge refused to put the patient in restraints, despite Johnson's request. As she left the unit to get a medical evaluation of her injuries, Johnson again encountered the patient.

The nurse in charge wrote a report accusing Johnson of threatening the patient as she left the unit. On November 9, 1994, Read conducted a predisciplinary meeting. Joan Bashaw-White, Read's labor relations administrator, and Vanda Sakalauskas, the assistant director of nursing, decided to suspend Johnson for 16 days, beginning on December 7, 1994. Johnson decided to complain to the Department of Human Rights about racial discrimination in the imposition of the sanction.

Read scheduled Johnson to work a double shift of 16 hours on November 26, 1994, as well as a regular shift the following day. Johnson asked the nurse in charge and the evening coordinator for permission to take her break for the second shift at the end of the shift, so that she could leave early. The nurse assigned her to watch a particular patient, one on one, during the second shift.

When any employee on a one-on-one assignment takes a break, the employee needs to arrange for a coworker to cover for her by attending to the patient one on one for the duration of the break. Johnson left the hospital a half hour before the end of her second shift. She asked a coworker to cover her one-on-one assignment, and the coworker did so.

On December 14, 1994, Johnson, who is black, filed her complaint charging Read with racial discrimination in the imposition of the 16-day suspension. A few days after she returned to work following the suspension, Read suspended her again, this time pending discharge. Read claimed that Johnson's actions on November 26 warranted the discharge. Read discharged Johnson on January 11, 1995. Johnson

amended her complaint to add claims that Read discharged her based on racial discrimination and in retaliation for the filing of the initial complaint.

The Human Rights Commission's administrative law judge (ALJ) heard evidence pertaining to both the suspension, based on the August incident, and the discharge, based on the November incident. In his recommended order he sharply distinguished between the two incidents. We, too, will treat the two incidents separately.

Regarding the August incident, Sakalauskas, who is not black, testified that she and Bashaw-White, who also is not black, relied on the findings of the Office of the Inspector General (OIG). They accepted the OIG's finding that Johnson threatened the patient as the nurse in charge alleged.

Johnson presented evidence she made no such threat. Bashaw-White admitted that Read, with Bashaw-White's approval, suspended a nonblack technician for one day after the technician threw an ashtray at a patient.

The ALJ found that the report of verbal threats provided a nondiscriminatory reason for the suspension, but Johnson proved that the given reason served only as a pretext for racial discrimination. The far less severe punishment imposed on a comparable nonblack employee for more serious misconduct proved racial animus. The ALJ held that Johnson's alleged misconduct warranted at most a suspension for one day. Accordingly, he recommended awarding her wages for 15 days, plus attorney fees. The Human Rights Commission adopted the ALJ's recommendation. Read has not challenged the ruling. Insofar as it is part of the order from which the appeal formally arises, we affirm that part of the Commission's decision.

For the November incident, Read accused Johnson of neglect of duty and unauthorized absence for leaving before the end of her shift, and with insubordination and unprofessional conduct for cursing at a nurse. Dr. Thomas Simpatico, superintendent of Read, reviewed and approved Sakalauskas' and Bashaw-White's decision to discharge Johnson. He testified that the most serious charge, warranting severe discipline, was the charge that Johnson neglected her duty by leaving her one-on-one assignment without authorization.

Sakalauskas testified that she relied primarily on the written statement of the nurse in charge. That nurse wrote that Johnson demanded a late break, to end with the end of the shift at 10:45 p.m. When another nurse came to relieve her at 9 p.m., Johnson cursed at the nurse and refused to leave. The nurse in charge wrote that neither she nor the evening coordinator authorized Johnson to take a break at the end of her shift.

The nurse in charge did not testify. Johnson presented evidence that the nurse in charge later tried to withdraw the report because it was false. In particular, Johnson presented evidence that the nurse in charge knew that the evening coordinator had given Johnson permission to take a late break, allowing her to leave before the end of the shift.

Read presented no evidence to contradict Johnson's proof that she asked a coworker to cover for her when she took breaks from her one-on-one assignment and that the coworker did so. None of Read's witnesses mentioned an OIG report of the November incident, and Read presented no such report. Sakalauskas said that OIG investigations usually take about two months to complete. The proceedings to discharge Johnson took place about one month after the November incident.

Johnson also presented uncontradicted evidence that other staff members received no discipline for cursing. Read suspended a non-black nurse for 30 days because the nurse deserted her post, without backup, for at least 15 minutes.

In September 1995 a nurse assigned a nonblack technician to watch a particular patient, one on one, because the patient had been acting out sexually. The technician abandoned the assignment. About 45 minutes after the assignment began, staff members found the patient in a bathroom, having sexual intercourse with another patient. Read suspended the technician for 15 days.

The ALJ found that Read based its decision to discharge Johnson on the OIG's report concerning the November incident. He specifically refused to decide whether Johnson committed the alleged misconduct, noting the conflicting evidence. He found that Read's decision-makers "did not look beyond the OIG report when deciding to discharge" Johnson. The ALJ then determined that the OIG report of the November incident provided a legitimate, nondiscriminatory reason for the discharge, and Johnson failed to prove that the report was a pretext for unlawful discrimination or retaliation. The ALJ recommended dismissing with prejudice the claims challenging the decision to discharge Johnson.

In her exceptions to the ALJ's recommendation, Johnson pointed out that prior to discharge the OIG submitted no report to the decision-makers concerning the November incident. Nonetheless, the Commission adopted the ALJ's recommendations without amendment. Johnson petitioned for rehearing, again emphasizing the improper reliance on a nonexistent OIG report. The Commission denied the petition without referring to the factual finding of an OIG report. Johnson appeals from the Commission's order directly to this court.

■ The Administrative Review Law governs our review of the Commission's decision. We will not disturb the Commission's findings of fact unless the manifest weight of the evidence contradicts those findings. *Oregon Community Unit School District No. 220 v. Property Tax Appeal Board*, 285 Ill. App. 3d 170, 175, 674 N.E.2d 129 (1996). If the record sufficiently supports the findings of fact, we then apply the law to those facts. *Oregon*, 285 Ill. App. 3d at 176. While we give substantial weight to the agency's interpretation of law, we must independently analyze the law in applying it to the facts. *Oregon*, 285 Ill. App. 3d at 175-76.

Here, the Commission found that Read decided to discharge Johnson exclusively on the basis of an OIG report concerning the November incident. The evidence in the record directly contradicts the finding. The ALJ heard no evidence of an OIG report concerning the November incident.

■ The cases discussing review of agency decisions provide little guidance for procedures when the record contradicts one of the agency's findings. But, based on the dispositions of appeals following such findings, we find that the appellate court should first determine whether the factual findings independent of the error provide a sufficient basis for the agency's decision. See *Basketfield v. Police Board*, 56 Ill. 2d 351, 361, 307 N.E.2d 371 (1974); *Swanson v. Board of Police Commissioners*, 197 Ill. App. 3d 592, 605-07, 555 N.E.2d 35 (1990). If the facts provide such a basis, we will affirm the decision. But if the decision lacks adequate support without the manifestly erroneous finding, we must reverse. *Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board*, 202 Ill. App. 3d 559, 566, 560 N.E.2d 627 (1990).

■ If we must reverse, we then face the question of whether to remand to the agency for further proceedings. Where the record will permit only one determination, we may impose that determination. *Calabrese v. Chicago Park District*, 294 Ill. App. 3d 1055, 1065, 691 N.E.2d 850 (1998). But this court lacks authority to "evaluate the credibility of the witnesses or resolve conflicting evidence." *Przislicki v. City of Chicago*, 212 Ill. App. 3d 661, 668, 571 N.E.2d 762 (1991); see *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 735, 658 N.E.2d 1194 (1995). If varying credibility evaluations could support differing resolutions of a case, we must remand to the agency for findings of fact. See *Christ Hospital & Medical Center v. Human Rights Comm'n*, 293 Ill. App. 3d 105, 112-13, 687 N.E.2d 1090 (1997).

■ We proceed to decide whether the Commission's findings of fact independent of the mistake suffice to support the decision. As a gen-

eral pattern for employment discrimination litigation, the plaintiff must first establish a *prima facie* case. Second, to rebut the presumption of discrimination arising from the plaintiff's evidence, the employer must articulate a legitimate, nondiscriminatory reason for its conduct. If the employer does so, the plaintiff must prove by a preponderance of the evidence that the stated reason is only a pretext for unlawful discrimination. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684 (1989). But if the employer articulates a reason for its actions, the agency or court need not decide whether the plaintiff stated a *prima facie* case. The sole question is whether the plaintiff can show that the given reason is a pretext for unlawful discrimination. *Clyde v. Human Rights Comm'n*, 206 Ill. App. 3d 283, 293, 564 N.E.2d 265 (1990).

■ Since Read attempted to state a legitimate, nondiscriminatory reason for discharging Johnson, the Commission did not need to determine whether Johnson established a *prima facie* case of race discrimination or retaliatory discharge. The Commission found that an OIG report concerning the November incident provided Read's legitimate, nondiscriminatory reason for the discharge. The Commission adopted the ALJ's specific refusal to address the conflicting evidence as to Johnson's alleged misconduct. Thus, without the manifestly erroneous finding of reliance on a nonexistent OIG report, the Commission has made no factual findings that could support the decision to dismiss Johnson's claims relating to her discharge.

The determination of facts based on the conflicting evidence relating to Johnson's discharge depends largely on the credibility of the witnesses. If the Commission accepts Johnson's evidence, no discipline would appear justified, but if the Commission believes Read's witnesses and the hearsay evidence from the written report of the nurse in charge, Read might justifiably discipline her as it would any non-black employee guilty of misconduct of similar severity. This is not a case in which we can say that crucial testimony is so improbable that acceptance of that testimony is contrary to the manifest weight of the evidence. See *Basketfield*, 56 Ill. 2d at 359; *Polk v. Board of Trustees of the Police Pension Fund*, 253 Ill. App. 3d 525, 536-37, 624 N.E.2d 1366 (1993). Therefore we remand to the Commission for findings of fact.

Our research uncovered one case in which an appellate court drew conclusions in a manner inconsistent with our resolution of this case. In *Russ Berrie & Co. v. Human Rights Comm'n*, 224 Ill. App. 3d 874, 586 N.E.2d 1301 (1992), the Commission found that a job applicant included a misrepresentation on his resume, and that gave the employer a legitimate reason for refusing to hire the applicant. The applicant presented evidence that the misrepresentation had no bear-

ing on the employer's decision. He also said that in the job interview the employer asked him whether he felt inferior to white people and whether he could sell to white people. The employer denied asking the question. The ALJ found the applicant more credible, in part because he found corroboration from another applicant. The ALJ recommended finding that the employer's stated reason was a pretext for racial discrimination. The Commission adopted the ALJ's recommendation.

The appellate court found that the record did not support the ALJ's finding of corroboration for the applicant's testimony. The appellate court further decided that, in the absence of corroboration, the applicant was not as credible as the employer. *Berrie*, 224 Ill. App. 3d at 879. Accordingly, the appellate court reversed the Commission's decision without remand.

The decision in *Berrie* conflicts with the principle that on administrative review the courts lack competence to determine the credibility of witnesses or the weight to give the testimony of each witness. *Zaderaka*, 131 Ill. 2d at 181. We must follow *Zaderaka* and not *Berrie*.

Finally, we note that even if the ALJ finds that Read heard sufficient credible evidence that Johnson committed the alleged misconduct, Johnson may still be able to meet her burden of showing that racial discrimination or retaliation caused her discharge. Johnson presented evidence that a nonblack technician committed much more serious misconduct, by leaving a one-on-one assignment without arranging for a coworker to continue the supervision. Read suspended that technician for only 15 days. The cases are not identical, because that technician had no prior discipline, whereas Johnson had, for the August incident, a one-day suspension. And Read also charged Johnson with multiple, lesser infractions, at least one of which appears to be for common conduct for which other employees receive no discipline. But the cases need not be precisely equivalent. *Loyola University v. Human Rights Comm'n*, 149 Ill. App. 3d 8, 19, 500 N.E.2d 639 (1986). The differences in the situations must justify the disparate treatment. See *Loyola*, 149 Ill. App. 3d at 21.

Also, the nurse who left her post unattended apparently committed a more serious infraction than Johnson. As Read subjects nurses and technicians to the same disciplinary policy, the mere difference in position cannot render the nurse incomparable to Johnson. See *Quincy School District No. 172 v. Human Rights Comm'n*, 197 Ill. App. 3d 694, 703, 555 N.E.2d 21 (1990).

Without any evidence that the OIG completed a report concerning the November incident, the ALJ found that Read's decision-makers relied exclusively on the OIG report when they decided to discharge

Johnson. The Commission adopted the ALJ's findings without amendment. The ALJ and the Commission found that the OIG report provided the legitimate, nondiscriminatory reason for discharging Johnson. The ALJ and the Commission expressly refused to decide whether Johnson committed the alleged misconduct. Thus, without the erroneous finding concerning the OIG report, the Commission lacked sufficient findings of fact to support the decision to dismiss Johnson's claims based on her discharge. We cannot draw any conclusive findings without evaluating the credibility of contested evidence. Therefore, we reverse the decision to dismiss Johnson's claims for retaliatory discharge and racial discrimination in the decision to discharge her. Because Read has not objected to the award of back pay and attorney fees for racial discrimination in the decision to suspend Johnson, we affirm that part of the Commission's decision. We remand for further proceedings in accord with this opinion.

Affirmed in part and reversed in part; cause remanded.

TULLY and COHEN, JJ., concur.